IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **KELSIE DREW ELROD,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cv-00991-ECM-JTA |
| | ) | **Demand for Jury Trial** |
| **CITY OF MILLBROOK,** | ) | |
| **AUTAUGA COUNTY,** | ) | |
| **ELMORE COUNTY,** | ) | |
| **JESSICA K. SANDERS** | ) | |
| **JOY PACE BOOTH,** | ) | |
| **BRADLEY HAWLEY,** | ) | |
| **DEBRA HILL,** | ) | |
| **TERINNA MOON,** | ) | |
| **AHMAUD MAXIE** | ) | |
| **JULIA COLLINS,** | ) | |
| **JOHN AND JANE DOES,** | ) | |
| *Defendants.* | ) | |

## COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983 AND CLAIMS FOR CONSTITUTIONAL VIOLATIONS, ABUSE OF PROCESS, AND EQUAL PROTECTION DENIAL

### I.  INTRODUCTION

1.    This civil-rights action arises under *42 U.S.C. § 1983* to challenge a sustained and

coordinated pattern of constitutional violations that unfolded across multiple overlapping

court proceedings within Alabama's 19th Judicial Circuit. Between October 2023 and the

present, Plaintiff was repeatedly denied due process, equal protection, and access to fair

judicial procedure while seeking safety and justice in matters involving domestic

violence, child custody, property, and housing.

2.    The violations at issue implicate fundamental rights to safety, family integrity, property,

and access to justice. What began as a single domestic-violence prosecution evolved into

a web of retaliatory and interconnected proceedings—each one shaping and weaponizing

the next against the same victim through selective enforcement, conflict of interest, and

abuse of authority.

- **The criminal-appeal cases** allowed defective service, downgraded charges, and repeated continuances that erased felony-level conduct and stripped the record of domestic-violence findings.
- **The divorce and custody case** relied on those diminished records to justify taking custody from the victim and labeling her as "abandoning" despite evidence of continuing abuse and contact.
- **The contempt and enforcement case**—filed to compel compliance with prior court orders—was later transferred to the same judge who had already ruled adversely, resulting in retaliatory dismissal and fabricated findings.
- **The eviction case** arose only after Plaintiff sought protection from further abuse, re-packaged as a landlord-tenant dispute to force her from safety housing and destroy the remaining stability she had rebuilt.

3.    Each proceeding fed the next: the softened criminal records informed the custody rulings,

the retaliatory family-court orders justified later enforcement actions, and the housing

case closed the cycle by depriving Plaintiff of shelter and property. What should have

been separate matters instead became an interconnected chain of retaliation and

constitutional deprivation carried out through overlapping officials, shared jurisdictions,

and off-record communication.

4.    The cumulative effect was the destruction of nearly every interest the Fourteenth

Amendment protects—family, liberty, property, reputation, and fair process. The ultimate

consequence of these constitutional violations was the forced separation of Plaintiff from

her children. After months of seeking protection and lawful remedies, systemic failures

left her without housing, transportation, or means to provide a safe environment. The

separation was not voluntary but the direct result of institutional neglect and retaliation,

representing the most severe deprivation of liberty and family integrity at the heart of this

action.

5.    Plaintiff possesses extensive documentary, digital, and video evidence supporting the

       allegations in this Complaint and will produce such evidence during discovery or at the

       Court's direction.

## II.  JURISDICTION & VENUE

6.    This Court has jurisdiction under *28 U.S.C. §§ 1331 and 1343* because this action arises

       under the Constitution and laws of the United States, including *42 U.S.C. § 1983*. The

       Court also has supplemental jurisdiction under *28 U.S.C. § 1367* over Plaintiff's state-law

       claims, as those claims are so related to the federal claims that they form part of the same

       case or controversy.

7.    Venue is proper under *28 U.S.C. § 1391(b)* because Defendants reside in, and a

       substantial part of the events or omissions giving rise to these claims occurred in, the

       Middle District of Alabama, Northern Division.

8.    Plaintiff further invokes *42 U.S.C. § 1988* for the award of costs and reasonable

       attorney's fees, and *28 U.S.C. §§ 2201–2202* for declaratory and injunctive relief as

       appropriate.

## III. PARTIES

9.    **Plaintiff Kelsie Drew Elrod:** A citizen and resident of Autauga County, Alabama. At all

       relevant times, Plaintiff was involved in multiple state court proceedings including

       divorce, custody, criminal, and eviction matters that form the basis of this Complaint.

       Plaintiff is the mother of two minor children referenced in this Complaint by initials

       pursuant to Fed. R. Civ. P. 5.2: K.F.M., her minor son (age 3), and K.A.M., her minor

       daughter (age 1). Both minor children were born to Plaintiff and Defendant Ahmaud

       Maxie.

3

10.    **City of Millbrook (Official Capacity – Municipal Entity)**: An Alabama municipal corporation responsible for the Millbrook Police Department and City Prosecutor's Office.

11.    **Elmore County (Official Capacity – County Entity)**: A political subdivision of the State of Alabama responsible for the Elmore County Sheriff's Department and Circuit Clerk's Office.

12.    **Autauga County (Official Capacity – County Entity)**: A political subdivision of the State of Alabama responsible for the Autauga County Circuit and District Courts and the Clerk's Office.

13.    **Judge Joy Pace Booth (Official & Individual Capacities)**: Circuit Court Judge of Alabama's 19th Judicial Circuit. Judge Booth presided over Plaintiff's divorce matter, contempt action, civil eviction appeal, and Defendant Maxie's domestic-violence appeal cases.

14.    **Judge Jessica K. Sanders (Official & Individual Capacities)**: District Court Judge for Autauga County. Judge Sanders presided over Plaintiff's protection-from-abuse filing and related eviction proceedings.

15.    **Bradley Hawley (Official & Individual Capacities)**: City Prosecutor for Millbrook, Alabama. Hawley handled Plaintiff's municipal criminal case and the domestic-violence appeal cases involving Defendant Maxie.

16.    **Debra Hill (Official & Individual Capacities)**: Clerk of Court for Autauga County, responsible for docketing, scheduling, and administrative case management.

17.    **Terinna Moon (Official Capacity Only)**: Special Master appointed in Plaintiff's divorce case in Autauga County.

4

18.   **Julia Collins (Individual Capacity)**: Former legal counsel for Plaintiff in her divorce
      and custody matter.

19.   **Ahmaud Maxie (Individual Capacity)**: Private individual, resident of Autauga County,
      and Plaintiff's former spouse.

20.   **John and Jane Does 1–10 (Individual & Official Capacities)**: Unknown state or
      municipal employees whose identities are presently unknown to Plaintiff.

### IV. IMMUNITY DOES NOT APPLY

21.   Defendant public officials are not entitled to absolute or qualified immunity where they

      acted outside the scope of legitimate judicial, prosecutorial, or quasi-judicial authority, or

      where they engaged in administrative, investigative, retaliatory, or conspiratorial conduct

      under color of state law. Plaintiff's claims are based solely on such non-immune conduct.

**Defendant Judge Joy Pace Booth — No Judicial Immunity**

22.   Defendant Judge Booth is sued in both her individual and official capacities for non-

      judicial and jurisdictionally void acts, including but not limited to:

      a) Entering ex parte orders without lawful service or notice;
      b) Acting in the complete absence of jurisdiction;
      c) Issuing retaliatory rulings in response to Plaintiff's protected activity;
      d) Coordinating with other state actors across counties to influence criminal, civil,
         and custody outcomes;
      e) Enforcing void orders based on defective service and fabricated record entries.

23.   These acts were administrative, retaliatory, and taken in the clear absence of jurisdiction,

      and therefore fall outside the protection of absolute judicial immunity.

**Defendant Judge Jessica K. Sanders — No Judicial Immunity**

24.   Defendant Judge Sanders is sued for non-judicial conduct, including:

      a) Acting without lawful notice;
      b) Participating in administrative interference with service and eviction proceedings;
      c) Issuing orders based on information obtained outside the adversarial process;

5

d) Failing to enforce statutory victim protections while permitting retaliatory judicial process.

25.    These actions were not taken in a traditional adjudicatory role and are not shielded by

absolute judicial immunity.

**Defendant Bradley Hawley — No Prosecutorial Immunity**

26.    Defendant Hawley is sued in both his individual and official capacities for acts outside

the scope of prosecutorial advocacy, including:

a) Acting as an investigator and witness rather than an advocate;
b) Suppressing victim-witness evidence;
c) Directing or influencing defective service of subpoenas;
d) Participating in retaliatory arrest and bond manipulation;
e) Interfering in civil proceedings outside criminal jurisdiction;
f) Coordinating with judicial and clerical officials to deprive Plaintiff of notice and participation.

27.    These acts were administrative, investigative, retaliatory, and conspiratorial, and are not

protected by prosecutorial immunity.

**Defendant Debra Hill — No Quasi-Judicial Immunity**

28.    Defendant Hill is sued for purely administrative misconduct, including:

a) Falsifying or misdirecting service and docket entries;
b) Withholding orders from lawful service;
c) Issuing defective hearing notices;
d) Altering or concealing material case information.

29.    Because this conduct was administrative and not ministerial compliance with judicial

directives, quasi-judicial immunity does not apply.

**Defendant Terinna Moon — No Quasi-Judicial Immunity**

30.    Defendant Moon is sued for non-adjudicatory and retaliatory conduct, including:

a) Engaging in off-record communications;
b) Excluding Plaintiff from proceedings;
c) Acting without neutral authority;
d) Participating in coordinated delay to deprive Plaintiff of custody relief.

31.     These acts exceed quasi-judicial protection and are not immune.

**Defendant Julia Collins — State Actor by Joint Participation**

32.     Defendant Collins, though a private attorney, acted under color of state law through joint

participation with judicial and prosecutorial defendants, including:

   a) Coordinated withdrawal timing;
   b) Suppression of evidence;
   c) Failure to challenge ex parte actions;
   d) Participation in procedural manipulation.

33.     Her conduct was made possible only through active cooperation with state officials,

subjecting her to § 1983 liability as a state actor.

**Defendant Ahmaud Maxie — State Actor by Conspiracy**

34.     Defendant Maxie is liable as a willful participant in a joint conspiracy with state actors
        to:

   a) Manipulate criminal and civil proceedings;
   b) Obtain ex parte custody relief;
   c) Evade enforcement of protection orders;
   d) Suppress victim evidence;
   e) Weaponize judicial process for retaliation.

35.     His conduct was undertaken in concert with and enabled by state actors, establishing

color-of-law liability.

**No Qualified Immunity**

36.     The constitutional rights violated were clearly established at all relevant times, including

the rights to notice, to be heard, to family integrity, to be free from retaliation, and to

equal protection.

37.     No reasonable official could have believed the conduct alleged herein was lawful.

38.     Accordingly, Defendants are not entitled to qualified immunity.

*V.  CIVIL CONSPIRACY UNDER 42 U.S.C. § 1983*

**Agreement and Common Objective**

39.   Defendants Judge Booth, Judge Sanders, Prosecutor Hawley, Clerk Hill, Special Master

Moon, Attorney Collins, and Defendant Maxie knowingly entered into and participated in

a common plan and mutual understanding to deprive Plaintiff of her constitutional rights.

40.   The shared objective of the conspiracy was to:

   a) Suppress domestic-violence evidence;
   b) Prevent full criminal-justice enforcement;'
   c) Manipulate service and notice to exclude Plaintiff from hearings;
   d) Transfer custody through ex parte means;
   e) Destroy Plaintiff's housing, transportation, and livelihood;
   f) Retaliate against Plaintiff for protected legal activity.

41.   Each Defendant knew of the conspiracy's objective and voluntarily participated in acts to

further it.

**Overt Acts in Furtherance**

42.   Clerk Hill issued or permitted defective service and misaddressed notices, enabling ex

parte actions.

43.   Judges Booth and Moon issued rulings with knowledge that Plaintiff had not been

properly served.

44.   Prosecutor Hawley withheld victim evidence and allowed dismissals without Plaintiff's

participation.

45.   Attorney Collins failed to disclose conflicts, challenge defective service, object to ex

parte action, and withheld material filings.

46.   Defendant Maxie provided false information used to obtain ex parte relief and continued

violations knowing enforcement would not occur.

47.   Defendants coordinated actions across criminal, custody, contempt, and eviction

proceedings to consistently favor Defendant Maxie and disadvantage Plaintiff.

48.    The coordinated acts of defective service, ex parte hearings, evidence suppression,

enforcement delay, criminal dismissal, custody transfer, and eviction demonstrate

concerted action that could not have occurred independently.

**Temporal and Functional Overlap**

49.    While Defendant Booth presided simultaneously over criminal appeals and custody

proceedings, rulings in one forum were used to justify outcomes in another.

50.    During this same period:

    a) Hawley controlled criminal posture,
    b) Hill controlled notice,
    c) Moon controlled custody recommendations,
    d) Collins controlled Plaintiff's litigation access,
    e) Maxie benefitted from each failure of enforcement.

51.    This alignment demonstrates a functional division of labor, evidencing coordination.

**State Action by Private Defendants**

52.    Defendants Collins and Maxie acted under color of state law by jointly participating in

procedural manipulation enabled only through official authority.

53.    Their conduct constitutes joint action sufficient to establish § 1983 liability.

**Constitutional Injuries**

54.    As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered:

    a) Deprivation of notice and hearing;
    b) Loss of custody;
    c) Suppression of evidence;
    d) Retaliatory enforcement;
    e) Loss of housing and transportation;
    f) Financial devastation;
    g) Severe emotional distress;
    h) Public humiliation.

**Continuing Conspiracy**

55.    The conspiracy is ongoing, and Plaintiff seeks prospective relief to terminate its

continuing effects.

## *VI. STATEMENT OF FACTS*

**August 16–October 21, 2023 – Ignored Warrants And Failure To Enforce**

56.    On August 16, 2023, Defendant Ahmaud Maxie threatened neighbor Tamara Marshall
       after she complained about his behavior, yelling, "I'll kill you and your whole family."
       Officer L. Hatfield documented the encounter and, after Maxie refused to provide
       identification and acted aggressively, signed a warrant for Obstructing Governmental
       Operations. The following day, August 17, 2023, Ms. Marshall appeared before
       Magistrate Becky Bellinger and swore out a separate warrant for Harassment based on
       the same incident.

57.    Despite two active warrants for violent and obstructive conduct, no arrest was made. Law
       enforcement took no steps to serve or enforce them for more than two months. Plaintiff
       did not learn of the outstanding warrants until the assault on October 22, 2023, the
       circumstances of which are detailed in the next paragraph. Only then did the August
       warrants surface during booking.

58.    The prolonged inaction left both women unprotected and reflects a pattern of neglect and
       selective enforcement toward repeat offenders. Had the August warrants been promptly
       executed, the October 22 assault might have been prevented.

**October 2023 – Assault During Pregnancy And Police Arrest**

59.    On October 21, 2023, Plaintiff—approximately five months pregnant and experiencing
       pregnancy-related distress, including hyperemesis gravidarum requiring a PICC line, IV
       Zofran, and hospice-based home health support—was transported by ambulance to
       Baptist Medical Center East and discharged at approximately 8:00 p.m.

60.    Defendant Maxie picked Plaintiff up from the hospital and took her to a Halloween
       gathering where he consumed alcohol. During the drive home, Defendant became

intoxicated, yelled, and cursed at Plaintiff without provocation. Fearing for her safety, Plaintiff began recording on her phone.

61.   At approximately 1:00 a.m. on October 22, 2023, the parties returned to the marital residence. Defendant remained verbally abusive, which escalated into physical violence. When Plaintiff attempted to lock him out after he went outside, Defendant forced entry by breaking the glass pane of the back door, destroyed property, and assaulted Plaintiff, causing visible injuries.

62.   Plaintiff attempted to call 911, but Defendant terminated the call, threw her phone, and fled the scene in his truck.

63.   At the time of this incident, Defendant already had two outstanding warrants issued weeks earlier—one stemming from a neighbor's Domestic Violence 3rd-Degree (Harassment) complaint and another for Obstructing Governmental Operations arising from his conduct toward responding officers.

64.   Following his flight from the residence, Millbrook Police stopped Defendant shortly after he left the neighborhood, discovered the outstanding warrants, and placed him under arrest. He was additionally charged with Domestic Violence 3rd Degree, Obstructing Governmental Operations, Interference with a 911 Call, Resisting Arrest, and Driving Under the Influence.

65.   According to the Millbrook Police narrative, officers located Defendant driving a green Ford F-350 shortly after the 911 call. Defendant refused multiple commands, opened his door while yelling at officers, and had to be tased before being taken into custody. The report documented open containers of alcohol in the vehicle and a blood-alcohol concentration of .09.

11

66.    These facts show both the volatility of the incident and the degree of danger faced by
       Plaintiff and law enforcement, underscoring that the misdemeanor classification and
       prompt bond release were grossly inappropriate.

67.    The assault of a pregnant woman constitutes a felony under *Ala. Code § 13A-6-20(a)(5).*
       Despite clear evidence of physical injury, pregnancy, and Defendant's violent conduct,
       prosecutors charged only a misdemeanor Domestic Violence 3rd. No explanation or
       justification was provided for declining the felony pregnancy-assault charge. This
       decision minimized the severity of the offense, denied Plaintiff statutory protections, and
       demonstrated deliberate indifference to the safety of pregnant victims of domestic
       violence.

68.    On the morning of October 23, 2023, shortly after his release, Defendant returned to
       Plaintiff's residence around 7:00 a.m., banged on windows, and called out to her. Later
       that morning he sent apologetic messages saying he was sorry and that he "just wanted to
       come take a shower and eat, then he would leave," demonstrating continued disregard for
       lawful boundaries and ongoing manipulation of the victim.

69.    Plaintiff did not open the door and instead contacted Defendant's father to intervene.
       During this period she was bedridden, financially dependent, and isolated, and Defendant
       withheld payment of household bills unless she allowed him to return.

**Late 2023 – Financial Control And Threats To Evict Pregnant Plaintiff**

70.    Through November and December 2023, Defendant Maxie continued alternating between
       affection and hostility. When Plaintiff attempted to maintain boundaries, Defendant
       responded with threats to withdraw financial support and terminate housing.

71.     In text messages sent during this period, Defendant stated that Plaintiff "needed to start looking for a place for [her] and K.A.M" refusing to place his name on the lease and declaring that he "wasn't willing to work [things] out anymore."

72.     Defendant repeatedly withheld or misused funds designated for rent, utilities, and vehicle payments, blaming Plaintiff or fabricating excuses about his own bills while insisting she was "ungrateful." This created constant instability, leaving Plaintiff unable to predict whether essential expenses would be paid from week to week.

73.     Defendant's communications show rapid shifts from apology ("I love you and I'm sorry," "I'll fight like hell to fix this family") to verbal aggression and financial retaliation ("you need to start looking for a place," "I'm not paying those bills"). These fluctuations left Plaintiff emotionally exhausted and economically trapped.

74.     During this time, Plaintiff remained pregnant, medically fragile, and unable to work. Defendant's refusal to maintain consistent payments jeopardized the home, utilities, and transportation she relied on to attend medical appointments and care for her toddler.

**April 24, 2024 – Assault During Anniversary Trip (Recorded on Video)**

75.     On or about April 24, 2024, Plaintiff and Defendant Maxie were staying at a beach condominium for what was intended to be their anniversary weekend. During this time, an argument arose between the parties inside the condominium. Plaintiff began recording the interaction on her phone to document Defendant's escalating conduct.

76.     Upon noticing the recording, Defendant forcefully grabbed Plaintiff by the throat to seize the phone, applying sufficient pressure to Plaintiff's neck to cause her to audibly gasp for air. The incident was captured on video by Plaintiff's phone, which documents both the struggle and the moment Plaintiff had trouble breathing.

13

77. Following the assault, Defendant acted as though nothing had occurred. Plaintiff was afraid to report the incident out of fear of further retaliation, consistent with Defendant's prior threats and ongoing pattern of intimidation. This episode represented a significant escalation from previous incidents of verbal and emotional abuse to physical violence, forming part of Defendant's ongoing pattern of coercion and abuse leading up to subsequent incidents in May 2024.

**May 8, 2024 – Interference with Plaintiff's Efforts to Earn Income**

78. In May 2024, Plaintiff began working for DoorDash to earn income while caring for her two young children.

79. On May 8, 2024, after Defendant returned home around 6:00 p.m., Plaintiff asked Defendant to watch the children so she could complete deliveries during peak hours. Defendant refused, claiming he needed to "go back to work," despite not working evenings.

80. During an ensuing argument, while Plaintiff was holding the parties' three-month-old daughter with their toddler son nearby, Defendant seized Plaintiff's key fob, yelled at Plaintiff, and threw the key fob across the room, breaking it against the wall and damaging the drywall. Plaintiff recorded the outburst on video.

81. Defendant's actions interfered with Plaintiff's ability to work and support herself, demonstrating a continuing pattern of intimidation and control.

82. These incidents together established a documented pattern of escalating domestic violence and coercive control.

83. By May 2024, despite Defendant's October 22, 2023 domestic-violence arrest and a prior August 2022 incident involving another woman, Mrs. Marshall — as well as a separate warrant filed by an officer the same day for related conduct — the October case had been

14

reset without any new court date provided to Plaintiff. The matter remained dormant for months, with no enforcement or progress. Only after the June 14, 2024 assault did authorities suddenly schedule a hearing, grouping the new charge together with all prior unresolved matters. This reactive consolidation made it appear that earlier incidents had been ignored until another assault forced the system to act.

**June 14–15 – Assault, Strangulation, Interference with 911, and Car Theft**

84.    On the night of June 14 and into the early morning of June 15, 2024, at the marital home located at 178 Hidden Valley Road in Deatsville, Alabama, Defendant Maxie assaulted Plaintiff in the presence of their four-month-old baby and two-year-old son.

85.    Defendant placed his hands around Plaintiff's neck, strangled her, and struck her, leaving visible bruises on her arm and leg.

86.    When Plaintiff attempted to call 911, Defendant forcibly took her phone, stole her car keys, and drained their joint bank accounts. Before fleeing, Defendant struck Plaintiff on the back of the head, nearly causing unconsciousness.

87.    Plaintiff escaped through the front door to a neighbor's home, banging on the door for help. EMS responded, and Millbrook Police were dispatched, but Defendant had already fled the scene in his distinctive truck after taking the children with him.

88.    Plaintiff informed officers that Defendant was likely traveling to his father's residence on the nearby back road—where he typically fled after violent incidents—but law enforcement failed to locate or apprehend him despite the specific information provided.

89.    At approximately 2:00 a.m., Defendant left the children at his father's home and did not return. He appeared to do so to create the impression that he was acting responsibly, though in reality he abandoned them there and failed to provide further care or contact.

15

90.     Later that morning, after locating a spare car key, Plaintiff drove to her mother's
        residence at 550 Jasmine Trail in Prattville, Alabama, fearing for her safety.

91.     Defendant arrived at that residence, blocking the driveway with his truck and car hauler.
        As Plaintiff tried to run to access her vehicle, Defendant aggressively opened her car
        door, dented it, and attempted to forcibly take her key. The incident was captured on
        security camera.

92.     Plaintiff called 911, and a police report was filed for trespassing and attempted theft.
        Despite Plaintiff's recent report for assault and trespassing, Prattville Police declined to
        arrest Defendant, stating the Autauga County Jail was "under renovation."

93.     Shortly afterward, Kisha — who was caring for the children — contacted Plaintiff and
        asked her to pick them up, as Defendant had left them in the middle of the night and did
        not return. That evening, the children were back in Plaintiff's custody at the marital
        residence.

94.     Later that evening, Defendant Maxie returned to the marital residence with his car hauler
        while Plaintiff was at the neighbor's home—the same residence she had fled to for
        safety—and unlawfully removed and stole Plaintiff's vehicle. Despite Plaintiff's prior
        reports and available evidence, law enforcement again declined to arrest Defendant,
        citing his absence from the scene.

**June 17–18 – Warrant, Arrest, and Failure to Enforce Protection Order**

95.     On June 17, 2024, Plaintiff filed a warrant in Millbrook regarding the domestic-violence
        incident that occurred on June 14–15. That same week, Defendant Maxie posted
        Plaintiff's stolen vehicle for sale on Facebook Marketplace while she remained stranded
        at the house with the children.

16

96.   On June 18, 2024, Defendant surrendered to authorities on the domestic-violence warrant. That evening, Plaintiff learned from Kisha that Defendant was being served with a "Protection from Abuse (PFA) order" prohibiting contact with Plaintiff and the children for one year.

97.   Plaintiff herself, however, was never served with or provided a copy of such an order, and no court or law-enforcement agency ever confirmed its issuance. Later review indicated the restriction may instead have been part of Defendant's criminal-case conditions of release, which contained a "no contact with the victim whatsoever" clause.

98.   Regardless of whether the restriction arose from a formal PFA or from release conditions, authorities failed to enforce it, and Defendant repeatedly violated the no-contact prohibition in the weeks that followed.

99.   Under Alabama law, only the person restrained by a no-contact provision can violate it; the protected party is not subject to arrest or penalty simply for answering or initiating communication. Alabama's Domestic Violence Protection Order Enforcement Act defines the offense solely in terms of the defendant who "knowingly commits any act prohibited by a protection order" or "willfully fails to abide by any term of the order" (*Ala. Code § 13A-6-142*). In other words, any no-contact restriction—whether arising from a PFA or a criminal release condition—bound Defendant Maxie, not Plaintiff. Plaintiff could not legally "violate" an order she was never served with, did not request, and was not restrained under. Law enforcement's repeated statements implying that Plaintiff was prohibited from calling, texting, or responding to Defendant were incorrect under Alabama law and reflect the same discriminatory, victim-blaming pattern that characterized the handling of all related proceedings.

17

100.   By August 22, 2024, Defendant had accumulated roughly ten to eleven separate
       misdemeanor charges stemming from multiple domestic-violence and harassment
       incidents between August 2023 and June 2024. Rather than prosecuting these as distinct
       offenses that reflected a clear pattern of escalating violence, local prosecutors and clerks
       consolidated them into a single proceeding for convenience. That administrative choice
       erased the chronology of abuse, minimized the repeated danger to victims, and allowed
       Defendant to face the entire record as one combined case rather than as multiple,
       compounding acts of violence—resulting in leniency no similarly situated female victim
       would receive.

### June 21 – Attorney Retention and Hidden Judicial Conflict

101.   On June 21, 2024, Plaintiff retained attorney Julia Collins to represent her in divorce and
       custody proceedings before Judge Joy Booth. At the outset, Collins appeared engaged and
       filed emergency and responsive pleadings on Plaintiff's behalf, including a Rule 65(b)
       affidavit seeking protective relief based on Defendant's threats and conduct.

102.   Unknown to Plaintiff at the time, her newly retained attorney, Julia Dianne Collins, had
       previously been arrested and jailed for contempt by Judge Joy Pace Booth in June 2017
       during a juvenile-court matter in Autauga County—an event reported by The
       Montgomery Advertiser on June 29, 2017. Neither Collins nor Judge Booth disclosed this
       history at any point during Collins's representation in Maxie v. Elrod (DR-2024-900130).
       The undisclosed adversarial relationship created an inherent conflict of interest that
       compromised judicial impartiality from the outset of the divorce proceedings.

103.   As a result of this undisclosed conflict, the proceedings were tainted by bias and non-
       adversarial conduct. Throughout the case, Collins failed to object to ex parte rulings,
       present material evidence, or protect Plaintiff's rights, while Judge Booth issued orders

that consistently disadvantaged Plaintiff. The existence of a prior confrontation between the presiding judge and Plaintiff's counsel—kept hidden from the client—destroyed the appearance of neutrality required under the Fourteenth Amendment and rendered the divorce proceedings structurally defective and constitutionally void.

104.   Defendant's divorce filing on June 21, 2024 was never properly served on Plaintiff as required by the Alabama Rules of Civil Procedure. The return of service falsely stated that the summons was left with Plaintiff's mother at 178 Hidden Valley Road, Deatsville, even though her mother did not reside there on that date. Plaintiff was therefore deprived of notice and opportunity to respond, in violation of fundamental due-process rights.

105.   Defendant's petition also included false and unsubstantiated allegations, such as alleged drug use by Plaintiff, and sought broad subpoenas for her medical records. These claims were fabricated to conceal Defendant Maxie's own physical assaults and to preemptively discredit Plaintiff—the true reason for the parties' separation—and to frame himself favorably by rushing to file first. Judge Booth subsequently entered an ex parte HIPAA order granting Defendant's counsel access to Plaintiff's confidential medical information and shortening the compliance deadline to five days, despite no evidentiary basis for the accusations. The records ultimately produced contained no corroboration of Defendant's claims, rendering the court's order arbitrary and punitive.

106.   That same day, Collins filed a Rule 65(b) affidavit attesting under oath to the existence of a grave emergency—including Defendant's documented history of violence, pending criminal proceedings, and credible threats to Plaintiff and the children. Despite proper filing and a clear showing of exigent circumstances, the Court failed to act, denied

Plaintiff emergency protection, and thereby enabled continued violations and harassment by Defendant.

107. Later that evening, after meeting with her attorney, Plaintiff returned home and discovered that Defendant Maxie had unlawfully entered her residence, checked the mailbox, and left incoming mail on the counter along with a handwritten note addressed to her and the children. Believing Defendant was prohibited from entering due to the active no-contact order, Plaintiff notified Collins, who advised her to report the incident to law enforcement. Despite the report, no enforcement action followed.

108. This incident further demonstrates Defendant's continued violation of court orders and underscores the inadequacy of protection afforded by law enforcement and the courts.

109. Defendant fled after being seen. Plaintiff called law enforcement and provided a video recording of Defendant driving away. Plaintiff also notified Collins and received the reply: "call the cops again. maybe if u aggravate them enough they'll take it serious."

110. Despite Plaintiff's repeated reports and documentary evidence, law enforcement again failed to take any meaningful action. This incident illustrates Defendant's ongoing disregard for court-ordered boundaries and the persistent inadequacy of protection provided to Plaintiff and her children by local authorities.

111. Between June 27 and June 30, Defendant repeatedly violated his release conditions. Although law enforcement filed a warrant for one incident, which Defendant later turned himself in again on June 27, they ignored others despite Plaintiff's documented proof.

112. On June 30 around 3:00 a.m., Defendant unlawfully entered Plaintiff's home again.

113. Plaintiff was lying in bed when she heard the sound of Defendant Maxie's distinctive diesel truck pull into the driveway. Moments later, she heard her back door open,

20

immediately followed by the sound of his truck door closing and the vehicle driving
away.

114.  Defendant never entered the residence but deliberately opened the door and left it wide
open to intimidate and frighten Plaintiff.

115.  Shortly afterward, Defendant sent Plaintiff threatening messages through Facebook.
Despite her reports, law enforcement again failed to take any meaningful action.

**July 3–4, 2024 – Motion To Show Cause And Vehicle Sabotage**

116.  On July 3, Plaintiff's attorney filed a Motion to Show Cause after Defendant refused to
pay bills, return her vehicle, or comply with the no-contact provisions of the standing
PDL and status-quo order.

117.  Judge Booth ruled that the issues would be addressed at the July 9 PDL hearing but
ordered Defendant to provide Plaintiff with an adequate vehicle within twenty-four (24)
hours.

118.  Defendant abandoned Plaintiff's vehicle in the Millbrook Walmart parking lot overnight
with a flat tire and engine issues.

119.  While Plaintiff was airing up the tire at the Murphy gas station across the parking lot the
next morning, Defendant circled the area in his truck, which was easily identifiable
because of its large customized design.

120.  Plaintiff quickly left, entered the interstate in Millbrook, and broke down at the next exit
(Pine Level) in extreme heat. Thankfully, the kids were not with her.

121.  Defendant's father, Gus Maxie, retrieved Plaintiff, and while on the phone with
Defendant, observed that a hose under the hood had been disconnected. Plaintiff later
learned from Kisha that Defendant had also removed a fuse. Defendant "repaired" the
vehicle only after this, then abandoned it again overnight at the same Walmart.

21

122.    Although Judge Booth's order required Defendant to provide Plaintiff with an "adequate

        vehicle," the car remained unreliable because the insurance had been canceled and the tag

        had expired. Plaintiff had no financial ability to renew either due to Defendant's removal

        of all income and resources following the separation. These conditions rendered the

        vehicle illegal to drive and unusable for work, effectively destroying Plaintiff's ability to

        earn income or support her children.

**July 9, 2024 – Pdl Hearing And Due-Process Violations**

123.    On July 9, 2024, a pendente-lite hearing was held before Defendant Special Master

        Terinna "Tina" Moon. The court's order allocated thirty minutes for each side to present

        evidence and testimony.

124.    Plaintiff was excluded from most of the proceeding. While she waited outside the

        courtroom, Defendant Maxie, Defendant's attorney, Defendant Julia Collins, and

        Defendant Special Master Moon discussed the case without her.

125.    During the hearing, Plaintiff's attorney informed her that full custody was not available,

        despite Defendant's documented history of domestic violence, repeated violations of

        court orders, and ongoing safety concerns. Plaintiff was pressured to accept joint custody

        on the spot and was told that if she refused, Defendant Special Master Moon would make

        custody decisions for both parties.

126.    Plaintiff objected, was visibly distressed, and protested, but was told she had "no choice"

        by her counsel, Defendant Julia Collins, and was compelled to acquiesce under duress.

127.    Marital credit-card spending was discussed and incorrectly attributed to Plaintiff. Plaintiff

        made only a single purchase on July 3, 2024, for essential household items after

        Defendant Maxie drained the bank accounts and left her stranded; all other charges were

        made by Defendant,

                                                22

128.   The arrangement imposed at the hearing mandated joint physical custody on a week-to-week basis, awarded no child support due to both parties' unemployment, and allowed Plaintiff to retain possession of the marital residence.

129.   Plaintiff's July 3 Motion to Show Cause was never addressed, despite Judge Booth's prior directive. Defendant's refusal to pay bills, failure to return Plaintiff's vehicle, and repeated harassment remained unresolved.

130.   As a result, Plaintiff was denied court-ordered support, due process, and the protections previously promised, while Defendant's noncompliance continued.

**July 21, 2024 – Defendant Admits To Surveillance And Violating Court Orders**

131.   On July 21, 2024, Defendant sent Plaintiff a series of text messages in which he admitted to having "people watching that house," directly confirming that he was surveilling Plaintiff in violation of the no-contact and harassment provisions of the standing PDL order.

132.   Defendant's messages also pressured Plaintiff to remove his name from the marital lease and vehicle loan, offering to "leave [her] alone" only if she complied with his financial demands. This admission is significant for multiple reasons:

133.   At the time, Defendant was under restrictions prohibiting harassment, intimidation, and surveillance. By boasting of having "people watching" Plaintiff's home, Defendant directly admitted to conduct barred by the Court.

134.   Defendant tied his promise to "leave [Plaintiff] alone" to her removing his name from the lease and car, demonstrating coercive tactics to gain financial and legal advantage.

135.   Pattern of Intimidation – The admission of surveillance forms part of the broader pattern of stalking, intimidation, and coercive control already documented in this case.

23

136. This evidence, captured in Plaintiff's preserved text messages, is a rare instance of Defendant openly acknowledging his ongoing violations, undermining any claim that Plaintiff's allegations of harassment were unsubstantiated.

**August 5, 2024 – Utility Order And Additional Pdl Relief**

137. Defendant Ahmaud Maxie's Motion for Additional Pendente Lite Relief filed on August 5, 2024, was based entirely on false and defamatory claims mirrored in his attached exhibits, which the Court adopted without verification or holding a hearing.

138. On July 31, 2024, Plaintiff secured new employment after months without income or reliable transportation. During this time, her stepfather temporarily assisted by renewing the vehicle tag and adding Plaintiff to his insurance policy, which he paid for upfront.

139. Plaintiff was not scheduled to receive her first paycheck for approximately two weeks and was therefore obligated to repay her stepfather for the cost of the vehicle tag and her portion of the insurance once paid.

140. Before Plaintiff's financial situation could stabilize, Defendant Maxie accused Plaintiff of "partying," inviting unrelated men into the marital home, and frivolous spending in support of his request for additional pendente lite relief.

141. Defendant Judge Booth granted Defendant Maxie's motion without holding a hearing. In a signed order, Plaintiff was directed to assume responsibility for all household utilities, including electricity, water, and cable.

142. The order further prohibited Plaintiff from having unrelated overnight guests in the residence while the children were present.

143. Plaintiff remained in monetary crisis, relying on family and friends to cover basic needs and awaiting childcare assistance to place the children in daycare.

144. Defendant Maxie's motion relied on fabricated and misleading exhibits submitted as "evidence" in support of his claims such as:

   a) A photo of an anonymous arm with a tattoo, which Defendant falsely claimed belonged to Plaintiff, despite no identifiers linking the image to her.
   b) A photo of Plaintiff with her first cousin, which Defendant misrepresented as an unrelated man.
   c) Photos implying Plaintiff purchased new tires, speakers, and vehicle accessories; the images actually showed Plaintiff cleaning her car after regaining possession on July 4, 2024, following Defendant's neglect and damage.
   d) A photo of a red truck Defendant claimed belonged to a man visiting Plaintiff. The truck was parked in a neighbor's yard, and the photo itself was taken from inside Defendant's own vehicle, with their daughter's diaper bag visible — evidence of stalking.
   e) A photo of Plaintiff with an old friend at Waffle House, submitted even though it was not Plaintiff's custodial week, rendering the exhibit irrelevant.

145. Rather than substantiating misconduct by Plaintiff, these exhibits documented Defendant's ongoing stalking and harassment, violating both the Standing Status Quo Order and his criminal release conditions.

146. Plaintiff's counsel, Defendant Julia Collins, received electronic notice of Defendant Maxie's motion through AlaFile. The motion was submitted at 3:28 p.m. near close of business, and Defendant Judge Booth signed the order less than seven hours later at 9:42 p.m. that same night.

147. Plaintiff's counsel had no realistic opportunity to review or respond before the order was entered.

148. The Court adopted Defendant's allegations wholesale and imposed new restrictions without holding a hearing or affording Plaintiff a meaningful opportunity to be heard. The order constituted ex parte relief in violation of Plaintiff's due-process rights.

149.    Plaintiff's attorney failed to take any corrective action after entry of the order, such as filing a motion to reconsider or object, leaving Plaintiff unprotected despite an obvious due-process violation.

**August 7, 2024 — Vehicle Tampering And Intimidation**

150.    On the morning of August 7, 2024, Plaintiff entered her 2017 Ford Explorer, started the vehicle, and began pulling forward out of the driveway, as she had parked facing toward the road the night before. Because the trash service had come that morning, Plaintiff stopped near the end of the driveway to roll the empty trash can back toward the house. As she was walking back to her vehicle, she immediately noticed that the rear license plate was missing. Upon closer inspection, both securing bolts were gone—one was lying on the driveway, and the other had been deliberately placed directly beneath the front driver-side tire.

151.    When Plaintiff initially pulled forward, the tire rolled over the bolt, puncturing it. The driver-side mirror was also bent backward, indicating that someone had recently made physical contact with the vehicle while positioning the bolt under the tire.

152.    Plaintiff photographed the damage and promptly contacted law enforcement to report the incident. Officers advised that no criminal action could be taken due to lack of direct physical evidence, despite Plaintiff's clear belief and explanation that she knew who was responsible. Several months later, between December 2024 and January 2025, during limited contact for child exchanges, Defendant Ahmaud Maxie admitted to Plaintiff that he had removed the tag himself.

153.    This act, combined with the later admission, constitutes deliberate tampering, harassment, and intimidation. It reflects Defendant's ongoing pattern of property interference and

coercive control intended to damage Plaintiff's vehicle, restrict her mobility, and instill

fear following unfavorable court rulings.

**August 23, 2024 – Multiple Convictions and Appeals Filed**

154. On August 23, 2024, after two prior continuances, Defendant was convicted in Millbrook

Municipal Court of multiple criminal offenses arising from separate domestic violence

incidents, threats, and interference with law enforcement. These convictions included:

- **MC-2023-000709 – Obstructing Governmental Operations**
  *Interfering with police and refusing to cooperate during an investigation on August 16, 2023.*
- **MC-2023-000710 – Harassment**
  *Threatening to kill a neighbor and her family on August 16, 2023.*
- **MC-2023-000711 – Domestic Violence 3rd (Harassment)**
  *Striking the Plaintiff in the face on October 22, 2023, causing swelling while she was pregnant.*
- **MC-2023-000712 – Domestic Violence – Criminal Mischief**
  *Breaking down the marital-home door, slapping the Plaintiff, and throwing a trash can of vomit on her on October 22, 2023.*
- **MC-2023-000714 – Obstructing Governmental Operations**
  *Being aggressive and belligerent with police officers during the October 22, 2023 arrest.*
- **MC-2023-000715 – Resisting Arrest**
  *Resisting Millbrook Police during his October 22, 2023 domestic violence arrest.*
- **TR-2023-001638 – DUI**
  *Driving intoxicated immediately after the October 22, 2023 domestic violence assault.*
- **MC-2024-000373 – Domestic Violence 3rd (Harassment)**
  *Assaultive conduct toward the Plaintiff during the June 13–14, 2024 domestic violence incident.*
- **MC-2024-000374 – Interference With a Domestic-Violence Emergency Call**
  *Seizing the Plaintiff's phone while she attempted to call 911 during the June 13–14, 2024 incident.*
- **MC-2024-000407 – Violation of a Protection Order**
  *Contacting the Plaintiff in violation of active no-contact conditions.*

155. Despite the violent, escalating nature of these offenses—including assaults on a pregnant woman, interference with emergency communications, resisting arrest, threats to kill, and intoxicated driving—municipal authorities treated the conduct collectively as misdemeanor-level violations.

156. At the August 23, 2024 hearing, two charges from the October 22, 2023 incident—MC-2023-000715 (Resisting Arrest) and TR-2023-001638 (DUI)—were dismissed, minimizing the severity of the underlying conduct and further reducing Defendant's accountability.

157. The remaining convictions were consolidated into a small cluster of misdemeanor offenses, despite several meeting felony-level elements under Alabama law, including assault of a pregnant woman *(Ala. Code § 13A-6-20(a)(6)),* domestic violence by strangulation *(Ala. Code § 13A-6-138),* and interference with an emergency call committed during the commission of a violent assault.

158. Immediately following the convictions, all eight municipal-court cases were consolidated into two circuit-court appeals—CC-2024-000638 and CC-2024-000640—after Defendant filed notices of appeal.

159. Both appeals were assigned to Defendant Judge Joy Pace Booth, the same circuit judge simultaneously presiding over the Plaintiff's divorce and custody case (DR-2024-900130.00), creating an inherent conflict of interest by placing the same judge in control of both Defendant's criminal accountability and the Plaintiff's ongoing family-law litigation.

160. This overlapping jurisdiction concentrated authority over the Plaintiff's family safety, custody rights, and protection needs into a single judicial office that also held the power

to dismiss, minimize, or dilute Defendant's criminal liability—constituting a structural
and constitutional conflict.

161.    The treatment of these cases—combined with the reductions, dismissals, and failure to
apply felony-level charges—demonstrates a systemic pattern of minimizing domestic
violence and shielding Defendant from full accountability.

162.    These reductions, dismissals, and charging decisions—combined with the unusual
consolidation of all criminal appeals before the same judge handling the Plaintiff's
divorce—form part of the broader pattern of governmental indifference, selective
enforcement, and systemic protection of Defendant that underlies this civil rights action.

**Prosecutorial Misconduct, Jurisdictional Conflict, and Denial of Due Process During
Appeals**

163.    After Defendant Maxie filed his municipal-court appeals, Plaintiff attempted to determine
which office was responsible for prosecuting the cases. The docket listed the City of
Millbrook, the municipal prosecutor, and the Elmore County District Attorney's Office
simultaneously, creating immediate confusion about jurisdiction.

164.    When Plaintiff contacted the District Attorney's Office for clarification, she was
repeatedly told that the State was not handling the appeals and that she needed to speak
with the Clerk's Office instead—even though the cases had already been transferred to
Circuit Court under Alabama law.

165.    This misdirection created the false impression that the City of Millbrook still retained
prosecutorial authority. In reality, once a municipal conviction is appealed, Ala. Code §
12-17-184(2) vests exclusive jurisdiction in the District Attorney to prosecute all
municipal appeals.

166. Allowing the municipal prosecutor to remain on the record while the District Attorney simultaneously denied responsibility created a structural conflict between the City and the State. Neither entity took accountability, leaving Plaintiff with no clear prosecuting authority and no reliable point of contact.

167. Because no one would confirm who was responsible, Plaintiff continued contacting various offices until a Clerk's Office representative eventually informed her—by chance—that a hearing was scheduled for January 27, 2025. This was the first and only notice Plaintiff received regarding any appellate proceeding.

168. Plaintiff appeared at the January hearing alone, bringing written statements, photographs, and digital evidence documenting Defendant Maxie's ongoing violations, intoxicated driving, harassment, and threats. She had no attorney present and no information about who was prosecuting the appeal.

169. Upon arriving, Plaintiff approached a woman in the courtroom and explained that she had repeatedly been told by a District Attorney employee named "Crystal" that the State was not handling the case. The woman identified herself as Crystal—the same employee she had spoken with on the phone.

170. Crystal then brought out Defendant Prosecutor Bradley Hawley, introducing him as the attorney assigned to the appeal. This directly contradicted the repeated statements Plaintiff received from the DA's Office and revealed that critical information had been withheld.

171. Plaintiff provided Defendant Hawley with her evidence and written statements. Defendant Hawley assured her he would copy the materials and follow up with her afterward.

172.  Defendant Hawley never followed up. He never emailed, never called, never requested additional information, and never acknowledged any of the evidence she submitted. None of Plaintiff's materials ever appeared in the appellate court record.

173.  At the same time, Plaintiff was deprived of due process through defective service. Municipal-court subpoenas were repeatedly sent to a false address—"1748 Hidden Valley Rd, Millbrook"—instead of Plaintiff's actual residence, ensuring she received no notice while creating the appearance of proper service.

174.  When the appeals reached Circuit Court, subpoenas listing Plaintiff's correct Autauga County address were returned marked "NOT FOUND – Other/Autauga County," showing officials knew she lived in Autauga County but still did not attempt proper service or reissue notice.

175.  Despite these failures, proceedings continued as though Plaintiff had been properly notified, excluding her from hearings, communications, and decisions where she was the named victim in the underlying charges.

176.  Throughout the appeal cases (CC-2024-638 and CC-2024-640), Defendant Judge Joy Pace Booth issued repeated continuances—on December 12, 2024; January 27, 2025; March 3, 2025; April 8, 2025; and May 6, 2025—without Plaintiff ever being heard or her evidence ever being entered into the record.

177.  Defendant Hawley's silence and failure to prosecute left the appellate record devoid of videos, photos, call logs, and statements documenting Defendant Maxie's continued threats, intoxicated driving, domestic violence, and disregard for court orders.

31

178.  This omission falsely signaled to the court that there were no ongoing violations or safety
      concerns, minimizing the severity of Defendant Maxie's conduct and erasing the factual
      basis for enhanced charges or corrective action.

179.  On May 6, 2025, Defendant Judge Booth dismissed both appeal cases without Plaintiff
      present, without her evidence, without resolving the jurisdictional conflict, and without
      providing meaningful notice of the proceeding.

180.  These dismissals were procedurally defective. They occurred while service was
      incomplete, while the responsible prosecuting authority remained unconfirmed, and while
      the appellate file lacked all evidence submitted by the victim.

181.  As a result, felony-level domestic-violence behavior was removed from the judicial
      record without proper review, shielding Defendant Maxie from accountability and
      increasing the danger to Plaintiff.

182.  The combined actions and omissions of Defendant Judge Booth, Defendant Hawley, and
      court personnel created a system where Plaintiff was consistently misinformed, excluded,
      and silenced—violating her rights to notice, participation, and due process.

183.  Taken together, these failures form a coordinated pattern of misconduct that deprived
      Plaintiff of constitutional protections, undermined judicial integrity, and directly
      contributed to the wrongful dismissal of cases involving her safety and her children's
      safety.

**September 15–October 1, 2024 — Bond Violations, Judicial Conflict, And Delayed Custody
Hearing**

184.  On September 15, 2024, Defendant Ahmaud Maxie was arrested again in Elmore County
      for Public Intoxication, Disorderly Conduct, and Resisting Arrest. This new arrest
      occurred while he was already out on appeal bonds for his earlier domestic-violence

32

convictions in cases CC-2024-638 and CC-2024-640, which had been consolidated before Defendant Judge Joy Pace Booth in the Elmore County Circuit Court.

185.   Under Rule 7.5(b), Alabama Rules of Criminal Procedure, a defendant who is arrested while on bond is subject to immediate bond revocation. Despite this mandatory requirement, neither Defendant Prosecutor Bradley Hawley nor the Elmore County District Attorney's Office filed a motion to revoke or forfeit Maxie's existing appeal bonds. Instead, he was issued yet another bond and promptly released, enabling him to remain free even as his domestic-violence appeals were still pending before Defendant Judge Booth.

186.   Defendant Judge Booth and the prosecuting officials were aware of the new arrest and pending appeals but took no corrective action. Their inaction demonstrated preferential treatment and placed Plaintiff and the children at continued risk by allowing Maxie—who had repeatedly assaulted and harassed Plaintiff—to avoid accountability while still exercising custodial privileges.

187.   The Elmore County bond failure directly overlapped with the ongoing custody proceedings in Autauga County, also presided over by Defendant Judge Booth, creating a serious conflict of interest. The same judge responsible for ensuring criminal accountability in Maxie's appeal cases simultaneously controlled the custody proceedings involving his victims.

188.   The next day, September 16, 2024, Plaintiff filed a Motion for Pendente Lite Custody in the divorce case (DR-2024-900130.00), specifically citing the new arrest, Defendant's repeated endangerment of the children, and his ongoing criminal behavior as grounds for emergency protective relief.

33

189. On September 19, 2024, Defendant Judge Booth entered an order setting the PDL hearing for September 27, 2024, at 8:45 a.m. before Special Master Terinna Moon. That same day, Defendant's counsel, Jim T. Norman III, filed a motion to continue the hearing, claiming a scheduling conflict with another trial before Judge Pinkston.

190. On September 20, 2024, Defendant Judge Booth granted Defendant's continuance request and reset the hearing to October 1, 2024, at 8:45 a.m. Five days later, on September 25, 2024, the Court issued a second order denying "the continuance." The docket on the public Just One Look portal shows no intervening motion explaining this reversal. The existence of two conflicting court orders—one granting and one denying—created operative uncertainty about the controlling date and format.

191. On September 26, 2024, Clerk Debra Hill issued a Notice of Virtual Hearing converting the PDL hearing to a Zoom session at 9:00 a.m. on October 1, 2024. The notice was misaddressed—sent to the Clerk's own address and opposing counsel—but omitted Plaintiff's counsel, Julia Collins, depriving Plaintiff of proper notice or access. A separate "Courtesy Notice" was sent only to Special Master Moon, compounding the service defect.

192. Because no service or Zoom link was ever sent to Plaintiff's counsel, Plaintiff and her attorney appeared in person at the courthouse on the morning of October 1, 2024, believing that was the proper location. After being informed the hearing was instead before the Special Master, they then had to travel to Special Master Moon's office. The hearing proceeded in disarray, and no ruling was issued on Plaintiff's emergency custody motion but instead a continuance.

193. Later that same day, Special Master Moon entered a recommendation stating that
     Defendant's counsel had sought another continuance during the October 1 hearing,
     claiming Defendant was "in North Carolina." Plaintiff objected both to the continuance
     and to the Special Master presiding and demanded that the matter be heard directly before
     Judge Booth. Defendant Judge Booth subsequently reset the PDL hearing for November
     4, 2024, prolonging the delay and leaving the children unprotected for nearly two months
     after the triggering incident.

194. Meanwhile, Defendant's counsel began filing retaliatory pleadings—including a Motion
     for Order Requiring Day-Care Expenses to Be Split (September 26, 2024), despite
     Plaintiff having been employed for only two months and being the one who qualified for
     childcare assistance, which reduced Defendant's obligation to just $100 biweekly instead
     of $1,500 per month—and a Motion for Contempt/Rule Nisi (October 15, 2024). These
     filings were retaliatory and dishonest, built on lies and cherry-picked evidence, including
     edited screenshots, and were designed to distract the Court from Defendant's recent arrest
     and Plaintiff's pending custody motion by flipping the blame onto Plaintiff.

195. On October 16, 2024, at 10:27 a.m., Plaintiff's attorney filed a Response to Defendant's
     Motion for Contempt, exposing the falsifications and clarifying that Plaintiff's Family
     Guidance daycare card had simply been delayed in the mail, and that the provider had
     confirmed no disruption in care.

196. Despite this Response already appearing on the docket, Defendant Judge Booth entered
     an order at 12:50 p.m. that same day giving Plaintiff only forty-eight (48) hours to "show
     cause" regarding the same allegations. The order was entered after the Response was
     filed but without acknowledging it, threatening sanctions and disregarding the evidence

35

already submitted. This premature and duplicative order demonstrated clear retaliatory intent and a willful disregard for due process.

197.  The simultaneous mishandling of Defendant Maxie's criminal bond violations in Elmore County and the custody proceedings in Autauga County—both under Defendant Judge Booth's supervision—illustrates a unified pattern of judicial misconduct.

198.  By failing to revoke his appeal bonds while delaying Plaintiff's custody relief, Defendant Judge Booth protected the abuser instead of the victims, violating due process, judicial neutrality, and the equal protection of law.

**November 4–14, 2024 — Turning-Point Hearing, Orders, And Collapse Of Stability**

199.  On November 4, 2024, the Court convened what was noticed as Plaintiff's Emergency Motion for Pendente Lite Custody. Instead of addressing Plaintiff's request for temporary custody and the safety issues prompting it, the discussion shifted to her alleged employment termination — information publicly raised by Defendant Maxie's attorney, Trey Norman, even though Plaintiff had never disclosed it to anyone. This demonstrated improper access to her private employment records.

200.  The termination had occurred only two weeks prior to the November 4, 2024 hearing and bore no relevance to custody or safety. Plaintiff was shocked and confused by its mention in open court, as she had never disclosed this information to anyone. The timing and the fact that Defendant Maxie's counsel was aware of it strongly suggest improper access to Plaintiff's private employment records and coordination with outside sources.

201.  During the hearing, Defendant's Maxie's counsel was permitted to speak first, despite Plaintiff being the moving party. As Plaintiff's attorney, Julia Collins, attempted to respond, Defendant's attorney interrupted and yelled, "Julia, why are you telling all those damn lies," directly in open court.

36

202.    Defendant Judge Joy Booth did not reprimand him; instead, she abruptly called a ten-
        minute recess that lasted nearly an hour.

203.    After the recess, Judge Booth called both parties to the bench and questioned Plaintiff
        with invasive, gender-based inquiries about her mental health, medication, and personal
        relationships.

204.    Among other things, Judge Booth asked Plaintiff, "Do you have men sleeping in the bed
        with you?" — a question unrelated to custody or child safety.

205.    She ignored Defendant Maxie's criminal history, recent arrests, and conduct during
        custodial periods — including leaving the children with his brother without car seats
        while he was jailed. Judge Booth never asked Maxie comparable questions.

206.    When asked whether he was violent toward Plaintiff, Maxie smirked and replied that they
        were "both hostile" and that he "sometimes raises his voice." He admitted to drinking
        after work on his custodial weeks, claiming his mother would "pick up the kids" so he
        could "have a drink." Despite these admissions, Judge Booth took no action, stated she
        would "enter an order later," and adjourned the hearing.

**November 5, 2024 – Amended Pendente Lite Order (Retaliatory And One-Sided)**

207.    On November 5, 2024, Defendant Judge Booth entered an Amended Pendente Lite Order
        following the November 4 hearing. Rather than ruling on Plaintiff's emergency custody
        motion, Judge Booth simply re-issued the outdated July 17, 2024 order — labeling it
        "amended" — and ignored all new evidence and changed circumstances, including
        Defendant's recent arrest.

208.    The "amended" order failed to adjudicate Plaintiff's motion for sole custody and instead
        preserved the prior custody arrangement favoring Defendant. This refusal to modify

custody after documented arrests and continuing instability deprived Plaintiff of due
process and endangered the children.

209.   By relying on outdated findings instead of evaluating current conditions and making new
       written findings as required by Ala. Code § 30-3-152(a) and Rule 52(a), Ala. R. Civ. P.,
       the order was arbitrary, retaliatory, and constitutionally deficient under the Fourteenth
       Amendment.

210.   The order stated that the July 17 PDL "shall remain in place," effectively freezing the
       earlier PDL arrangement while disregarding Defendant's intervening arrest, intoxication
       evidence, and Plaintiff's detailed filings establishing danger.

211.   The order imposed multiple new obligations on Plaintiff while relieving Defendant of
       accountability:

212.   Plaintiff was ordered to begin paying rent in December 2024 or vacate the marital home,
       while Defendant was credited for the final month's rent.

213.   Defendant's child-support obligation was set at only $419 per month, far below Rule 32
       guidelines.

214.   Defendant was directed to "continue providing Mother with reliable transportation,"
       language that allowed him to retain control of the vehicle titled in Plaintiff's name.

215.   The order required "co-parenting counseling" with a counselor chosen and paid for by
       Defendant, granting him control over scheduling and the appearance of compliance.

216.   Plaintiff explained to her counsel, Defendant Julia Collins, that a close friend and
       coworker—who was present at the hearing—needed a place to live after moving out of
       her parents' home. The arrangement would have been mutually beneficial, allowing

Plaintiff to maintain the residence and provide stability for the children, who already knew and loved the friend as a family figure.

217.    Despite this reasonable plan, Defendant Collins never filed the motion or raised it before the Court, leaving Plaintiff without any viable means to comply with the new housing requirement.

218.    Between November 5 and 11, 2024, Plaintiff repeatedly attempted to coordinate the court-ordered co-parenting counseling as directed in the order. Defendant Maxie ignored every message and made no effort to participate, reflecting deliberate non-compliance with the Court's directive, likely motivated by resentment over being ordered to pay for the counseling and his refusal to engage in any cooperative process.

219.    Although Defendant's recent arrest involved intoxication and resisting police, the Court merely inserted a neutral clause that "neither party shall consume alcohol or drugs while the children are in their custody." This diluted proven misconduct into a shared prohibition, treating criminal behavior by one parent as mutual fault.

220.    The Amended PDL Order thus continued the pattern of bias and retaliation. It ignored Plaintiff's emergency filings, maintained joint custody despite safety threats, and imposed new financial and logistical burdens solely on her.

**November 11–14, 2024 – Ex Parte Custody Transfer And Collapse Of Stability**

221.    By November 11, 2024, the compounded stress, exhaustion, and financial collapse reached a breaking point. Plaintiff had been ordered by Defendant Judge Booth to begin paying rent or vacate the marital residence, was never granted approval to have a roommate, and was struggling to launch her cleaning business without income or support.

222.    Unable to afford rent, childcare, or basic living expenses, and with no safe housing options available for her children, Plaintiff reached a point of desperation. She wrote a

39

private handwritten letter to Defendant's family explaining that she could no longer

survive under the circumstances created by the Court's orders and Defendant Maxie's

continued control. Her letter clearly stated that she loved her children and was leaving

solely for safety and survival—not out of abandonment. Before leaving, Plaintiff packed

her personal belongings into the marital vehicle, a 2017 Ford Explorer, and drove away,

unsure where she would go or how she would rebuild her stability.

223.    Immediately following Plaintiff's departure, Defendant Maxie obtained and leaked her

private letter. Photographs of it were publicly posted in the City Watch Facebook group,

where Defendant and his associates falsely claimed that Plaintiff had "signed her rights

over." The publication of this personal document caused severe humiliation, emotional

distress, and reputational damage within her community.

224.    Following the post, numerous individuals began contacting and harassing Plaintiff

through social media messages, calling her degrading names and spreading false rumors.

The online harassment became so overwhelming that Plaintiff was forced to temporarily

deactivate her Facebook account for her own mental and emotional safety.

225.    On November 12, 2024, Defendant's attorney filed an Ex Parte Emergency Motion for

Custody in Autauga County Circuit Court, attaching Plaintiff's private letter as an exhibit.

That same day, without notice, hearing, or opportunity to respond, Defendant Judge

Booth granted the motion and awarded Defendant temporary sole custody of the parties'

minor children.

226.    On November 14, 2024, Judge Booth entered a written order in Maxie v. Elrod (DR-

2024-900130.00) formalizing the ex parte ruling. The order granted Defendant:

a)  Sole legal and physical custody of the minor children;

40

    b) Exclusive possession of the marital residence at 178 Hidden Valley Road, Deatsville, and the 2017 Ford Explorer;

    c) An order directing Plaintiff to immediately vacate the residence and sign all documents removing her name from the lease; and

    d) An order requiring Plaintiff to return the vehicle to Defendant Maxie's family business and execute all documents necessary to remove her name from the loan.

227. The November 14 order further stated that Plaintiff would receive a 2019 Ford Flex "free and clear" upon returning the 2017 Ford Explorer; however, no exchange ever occurred. Plaintiff complied fully and returned the Explorer, but Defendant never transferred the Flex or removed her name from the Explorer loan. Despite repeated efforts, Plaintiff was unable to have her name removed.

228. She contacted the financing bank directly, reached out to Defendant's attorney, emailed the Vice President of the leasing department, and even filed formal disputes with the major credit bureaus—but all attempts were ignored or denied.

229. As a result, Plaintiff remains financially liable for a $19,000 vehicle she does not possess and continues to suffer damage to her credit and financial reputation.

230. During this same period, Defendant continued to use the parties' joint credit card for personal expenses, making only partial payments to avoid default while increasing Plaintiff's financial liability and damaging her credit.

231. Defendant continued emailing and posting about Plaintiff on social media, harassing and misrepresenting her departure as abandonment.

232. Plaintiff's attempts to continue her business failed due to the loss of transportation and stability. The combined impact of the November 5 and November 14 orders—together with Defendant's ongoing financial exploitation, public harassment, and the Court's refusal to enforce its own directives—left Plaintiff without housing, transportation,

income, or access to her children. These compounded conditions directly led to her later

efforts in December 2024 to reconnect privately with them.

**No Abandonment Under Alabama Law**

233.    Any attempt to characterize Plaintiff's brief absence beginning November 11, 2024, as

"abandonment" is contrary to Ala. Code § 12-15-301(1), which defines abandonment as a

voluntary and prolonged relinquishment of parental responsibilities without good cause

and a failure to maintain contact or provide support. None of those conditions apply here.

234.    Before leaving, Plaintiff ensured her children were cared for and left them temporarily

with trusted relatives for safety and continuity of care.

235.    Plaintiff's absence lasted only a few weeks and was compelled by circumstances beyond

her control, including financial collapse, the court's rent-or-vacate order, denial of a

roommate arrangement, and Defendant's continued financial coercion. She resumed

contact with her children on or about December 17, 2024, and maintained consistent

communication and visitation thereafter.

236.    Plaintiff's brief separation was therefore the direct result of coercion, loss of housing, and

judicially created instability, not a willful or intentional relinquishment of parental duty.

Under Alabama law and the plain language of § 12-15-301(1), these facts cannot be

construed as abandonment.

237.    Furthermore, Alabama law recognizes that a parent who temporarily leaves the home to

escape abuse or protect themselves and their children acts with good cause and cannot be

found to have abandoned them. See Ala. Code § 12-15-301(1) and Ex parte J.M.P., 528

So.2d 1006 (Ala. 1988).

238.    Plaintiff's brief departure was driven by coercion, financial entrapment, and fear of

further harm—not a willful relinquishment of her children. Accordingly, her actions fall

squarely within the statutory "good cause" exception, and any claim of abandonment is legally and factually unfounded.

**November 21, 2024 – Continued Harassment And Defamation**

239. On November 21, 2024, an additional defamatory post appeared in the "City Watch" Facebook group. The post falsely alleged that Plaintiff attempted to steal her mother's vehicle and was engaged in an inappropriate relationship with her stepfather.

240. The post included photographs of police outside Plaintiff's mother's residence during a private emergency involving her mother's mental-health crisis.

241. It was published by an "Anonymous member," but the phrasing and content reflected language commonly used by Defendant Maxie and his associates.

242. No one outside Defendant's family knew the location of Plaintiff's mother's home, and Plaintiff was not present that day—she was in court in Calera.

243. This demonstrates that Defendant either authored the post or arranged for its publication, furthering his campaign of harassment, humiliation, and defamation against Plaintiff

**November 21, 2024 – Stalking Incident**

244. Later that same evening, after returning home from court in Calera at approximately 6:00pm, Plaintiff was sitting in her stepfather's truck outside her mother's residence finishing up paperwork before she went inside when she noticed a diesel truck idling at the stop sign directly in front of the house.

245. Although there was no traffic, the vehicle did not move for several minutes. When Plaintiff looked over her shoulder, she saw Defendant Maxie sitting in the driver's seat watching the residence.

246.   Plaintiff immediately locked the doors and lowered herself in the seat, terrified.
       Defendant eventually pulled forward, slowly driving past Plaintiff's stepfather's truck
       before leaving the neighborhood.

247.   Plaintiff later confirmed through her home-surveillance system that it was Defendant,
       obtaining multiple videos of him lingering at the stop sign outside her mother's home.

248.   This stalking incident occurred the same night as the defamatory post, showing a
       coordinated pattern of harassment and intimidation.

249.   From that day forward, Plaintiff began monitoring the cameras regularly and observed
       Defendant's truck passing by on numerous occasions.

250.   Plaintiff saved several recordings, but the surveillance became so frequent that
       documenting every occurrence was impossible. These acts placed Plaintiff under constant
       stress and hypervigilance, compounding the trauma already inflicted by Defendant's
       harassment and defamation.

**November 26, 2024 – Email Chain with Counsel**

251.   On November 26, 2024, at 9:58 a.m., Plaintiff emailed Defendant Julia Collins to report
       ongoing stalking and harassment by Defendant Ahmaud Maxie and his family, describing
       fear for her safety and the upcoming December 12 plea date for Defendant's pending
       criminal charges. Plaintiff stated that Defendant continued to harass and monitor her
       despite having relinquished marital property and custody rights.

252.   At 10:02 a.m., Collins responded without addressing the reported safety concerns, asking
       only about a missed meeting and whether Plaintiff believed Defendant was "abusing or
       neglecting the kids." This exchange demonstrates counsel's awareness of Plaintiff's
       safety complaints and failure to act or escalate the matter for protective relief.

253.   This provides contemporaneous proof that Plaintiff notified counsel of ongoing

       harassment and threats months before subsequent court failures to protect her and her

       children, refuting any claim that counsel was unaware of the risk.

**December 14–15, 2024 – Plaintiff Secretly Arranges Contact with Her Children Through**
**Defendant's Girlfriend Due to Fear of Retaliation**

254.   During December 14–15, 2024, Plaintiff reached out privately to K.B., the woman

       staying in the residence with Defendant Maxie and the minor children. Plaintiff contacted

       K.B. instead of Defendant because any direct communication with Defendant led to

       threats, harassment, and manipulation, and Plaintiff feared further retaliation if she

       attempted to contact him directly. Plaintiff emphasized she did not want Defendant or his

       family to contact her at all and was reaching out solely to see her children safely.

255.   Throughout the conversation, K.B. confirmed multiple facts that directly contradict

       Defendant's later narrative and the court's finding of "abandonment":

256.   K.B. stated that the children "would love to see you," and specifically that Plaintiff's son

       asked about her every single day.

257.   Plaintiff repeatedly stated she wanted to see her children, loved them, and had never

       chosen to leave them.

258.   Plaintiff explained she had no stable housing at the time because Defendant had taken her

       vehicle, sabotaged her employment, and left her without transportation or safe options.

259.   Plaintiff stressed she was not trying to cause drama or conflict — she simply wanted

       peaceful contact and needed a safe third party to help facilitate it.

260.   The messages also revealed that Defendant was spreading false rumors in the community

       to justify withholding the children. K.B. relayed that people were assuming something

       "must be wrong" with Plaintiff because she had briefly stepped away. Plaintiff explained

that these assumptions began immediately after November 11, 2024, and stemmed from Defendant twisting the situation to make her look unstable. These rumors had no factual basis and ignored the real reasons for Plaintiff's temporary absence: coercive control, emotional abuse, complete financial collapse, and the unsafe environment Plaintiff was forced to escape.

261.   K.B. also admitted that Defendant himself was rarely the one caring for the children. She stated that she, not Defendant, was with the children most nights, while Defendant was frequently absent. This further contradicted Defendant's claims that Plaintiff was unable to parent while he was supposedly providing a "stable" environment.

262.   Plaintiff also pointed out the hypocrisy in Defendant's narrative: while Defendant regularly had other women staying in the home around the children and delegated their care to them, he attempted to portray Plaintiff as "unstable" simply because she spent two days out of town to get a break from the chaos and emotional abuse he had caused. Plaintiff explained that this short trip was the only opportunity she had to breathe and regain mental clarity during a period of extreme instability created by Defendant. K.B. acknowledged this and agreed that Defendant's reactions were controlling and irrational.

263.   Another key issue arose regarding the landlord paperwork. Defendant told K.B. that Plaintiff had not signed the lease-transfer documents — but when Plaintiff immediately sent proof that she had signed them, it became clear Defendant was the one refusing to complete the process. This further demonstrated his manipulation and intent to weaponize circumstances to keep the children away from Plaintiff.

264.   Throughout the exchange, Plaintiff's tone was consistent: calm, focused, and centered on the well-being of her children. She repeatedly stated she wanted no drama, no social-

46

media mess, and no further retaliation. She told K.B. she wanted the situation handled quietly because the children had already been hurt enough. These conversations show:

a) Plaintiff actively sought contact with her children.
b) Plaintiff attempted peaceful, supervised arrangements to avoid Defendant's harassment.
c) Defendant was the one blocking visitation and controlling the narrative.
d) The children missed Plaintiff and asked for her daily.

265. Plaintiff's temporary absence was due to survival under coercive control — not abandonment.

266. Defendant's claims of instability were manufactured and contradicted by his own girlfriend.

267. Every part of the December 14–15 evidence disproves the abandonment finding in the November 14 ex parte order and the March 14 final decree.

268. This exchange is direct, contemporaneous evidence that Plaintiff never abandoned her children, and that Defendant Maxie intentionally obstructed her contact while manipulating third parties to maintain control.

**December 18, 2024 – January 18, 2025 – Daily Care of The Children and Defendant's Control of Visitation**

269. On December 18, 2024, after five weeks of forced separation, Defendant Maxie picked Plaintiff up from her mother's residence. Plaintiff rode in the back seat with her children and was dropped off at the marital residence, where she remained to watch them while Defendant left.

270. From that day forward, Plaintiff resumed near-daily childcare until January 18, 2025.

271. During this time, Plaintiff was building her cleaning business. On December 13, 2024, she completed her first house-cleaning job since being fired, and by late December, her business was expanding due to holiday demand.

272.   Despite her workload, Plaintiff returned each day to care for her children whenever Defendant demanded.

273.   Text-Free message records confirm her consistent presence. Plaintiff wrote: "I was seeing the kids every day except two days, and one was because I worked all day."

274.   Defendant did not dispute this, instead replying: "I'm literally letting you have time with them…" demonstrating his use of access to the children as a tool of control.

275.   Plaintiff pushed back, writing: "U know damn well I do not come in and out their life. I am the best mother to those kids… I am not about to sit here either though and let u control me through my kids just because u get mad."

276.   The messages also show Plaintiff continuing to provide food, formula, clothing, and other essentials despite lacking reliable transportation or stable income. Defendant himself texted about coordinating groceries and formula, acknowledging Plaintiff's role in supporting the children.

**January 8, 2025 – Final Hearing Scheduled Without Plaintiff's Knowledge**

277.   On January 8, 2025, Judge Booth entered an order setting the final divorce hearing for March 7, 2025. Although Plaintiff's counsel, Defendant Julia Collins, received electronic notice of the order, Plaintiff was never informed of the scheduled date and remained completely unaware that a final hearing had been set.

**January 14, 2025 – Municipal Prosecutor Confirms Abandonment of Domestic-Violence Cases**

278.   On January 14, 2025, Plaintiff contacted former Millbrook Municipal Prosecutor Thomas Azar seeking clarification about the status of Defendant Maxie's outstanding domestic-violence and obstruction cases. Azar responded by text, stating that he was "no longer with the City" and that the cases were "turned over to the City Prosecutor's Office after [Defendant's] appeal." Azar confirmed he had no involvement after the appeals were

filed. This message established that by mid-January 2025, the City of Millbrook had fully relinquished control of all eight criminal cases, and responsibility rested entirely with the prosecuting authorities in Elmore County. Despite this, no member of the District Attorney's Office acted on the cases, reviewed Plaintiff's evidence, or enforced existing no-contact restrictions. The clarification also confirmed Plaintiff's longstanding concern that the cases had been left in limbo—neither actively prosecuted nor dismissed—while Defendant continued to violate release conditions with no consequence.

279. On January 18, 2025, Plaintiff had a scheduled cleaning client, and two additional customers called requesting in-person quotes. Plaintiff informed Defendant she would be later than usual, which triggered his anger.

280. Defendant Maxie berated Plaintiff for working instead of immediately returning to watch the children—consistent with his past pattern of sabotaging her ability to earn income.

281. After finishing work, Plaintiff drove to Defendant's residence around 8:00 p.m. Entering through the side door, she found her two young children crying and shivering in a bathtub with cold water, unsupervised, while Defendant Maxie sat on the couch, unable to see them.

282. Plaintiff rushed to remove the children from the tub, dressed them, and prepared bottles. She lay with them in her son's bed until they calmed down.

283. While Plaintiff cared for the children, Defendant ranted about subpoenas, yelled at Plaintiff while she was in bed with the children, and ordered her to move her car that was parked behind his truck.

284. Around 9:00 p.m., Defendant sat in his truck preparing to leave. He admitted he was going out drinking, consistent with his regular pattern on Thursday nights.

285. Knowing it was unsafe to remain overnight, Plaintiff kissed her children goodbye, gathered her belongings, and left.

286. Plaintiff did not voluntarily leave the marital residence without cause. Her decision to separate was the result of Defendant Maxie's escalating aggression and renewed controlling behavior following repeated attempts to maintain civil communication for the sake of co-parenting. Despite Plaintiff's efforts to cooperate, Defendant's conduct became increasingly volatile and intimidating. Plaintiff could no longer subject herself, or allow her young children to witness, their mother being demeaned and broken down again while she was trying to heal. The separation was therefore a direct and necessary response to Defendant's continuing pattern of abuse and coercive control, not abandonment under Alabama law.

287. This was the last time Plaintiff saw her children. January 18, 2025, marked the breaking point where she realized she could no longer endure Defendant's abuse or risk her safety by entering his home. From that night forward, Defendant cut off all contact between Plaintiff and her children.

### January–February 2025: Retaliatory Child-Support Filing, Fraudulent Financial Documents, and Ex Parte Order

288. After January 18, Plaintiff no longer entered Defendant Maxie's home but continued providing financial and physical care for her children. On January 22—her daughter's first birthday—Plaintiff purchased and assembled a $300 battery-powered toy car to match her son's. When she attempted to drop it off, Defendant Maxie told her she "wasn't invited" and to "just take it back." Plaintiff instead had her mother deliver the gift to the Maxie family's bail-bond office at 152 W. 5th St., Prattville, Alabama.

50

289.  That same week, around January 22, 2025, Defendant Maxie's attorney, Trey Norman,
      filed a Motion for Immediate Child Support in DR-2024-900130. Simultaneously,
      Norman filed both CS-41 financial affidavits and the CS-42 worksheet using his own
      electronic filing credentials, including a CS-41 purporting to be Plaintiff's. Plaintiff never
      reviewed, signed, approved, or authorized any CS-41 filed on her behalf. Plaintiff was
      never served with Defendant Maxie's CS-41 and was unaware of the contents.

290.  Upon information and belief, Defendant Maxie falsely represented himself as
      unemployed despite earning under-the-table income, receiving unreported financial
      assistance, and benefiting from government benefits tied to the children. Plaintiff had
      been providing receipts showing ongoing support—food, diapers, formula, clothing,
      medications—but her attorney, Defendant Julia Collins, never confirmed filing them.

291.  On February 5, 2025, Defendant Maxie's counsel submitted a proposed child-support
      order directly to the Court. At 8:31 PM that same night, Plaintiff immediately emailed
      Collins's office objecting to the proposed order, explaining:

      a) that she could not afford the amount,
      b) that Defendant Maxie had moved the children into his mother's home,
      c) that he received approximately $700 in food stamps,
      d) that he was not caring for the children,
      e) and that he had been inside Plaintiff's residence that same day.
      f) Despite the urgency, Collins's office took no action.

292.  By morning, February 6, 2025, at 9:07 AM, the Court had already signed and entered the
      order verbatim, without a hearing, without notice, and without reviewing any financial
      disclosures from Plaintiff. Collins's paralegal then emailed Plaintiff stating they were "in
      process to see if we can obtain the documents opposing counsel used," confirming that

the Court had entered judgment based solely on filings submitted under Trey Norman's code.

293.   Later that morning, Plaintiff emailed again, explaining she could not work due to ongoing retaliation inside the household and that her mother was siding with the Maxie family. Collins did nothing.

294.   On February 12, 2025, Plaintiff emailed Collins again requesting a continuance and explaining that:

   a)  her stepfather was in jail,
   b)  her mother was in a mental-health facility,
   c)  Plaintiff had been wrongfully arrested,
   d)  rumors linked to Defendant Maxie were destabilizing her home,
   e)  and she was unable to focus on preparing for trial.

295.   Despite being fully aware of Plaintiff's circumstances, Defendant Collins took no action to protect Plaintiff's rights and made no effort to correct or challenge the fraudulently-calculated child-support order.

296.   These events demonstrate that Defendant Maxie, his counsel, and Defendant Collins coordinated or permitted a fraudulent set of filings to be submitted under opposing counsel's code, depriving Plaintiff of notice, participation, and due process. The Court entered an order based entirely on falsified affidavits and ex parte communications, violating Plaintiff's constitutional rights under the Fourteenth Amendment.

297.   On February 12, 2025, Plaintiff explicitly instructed Defendant Collins to file a Motion to Continue the March 7, 2025, final hearing so Plaintiff could challenge the falsified CS-41 affidavits, the inflated child-support calculation, and the ex parte PDL order entered only days earlier. Collins acknowledged the request but never filed anything. When Plaintiff later obtained her client file, the only "Motion to Continue" found in the records was a

document dated October 16, 2024—months before the final hearing was ever scheduled. The filing referenced unrelated issues, contained incorrect dates, and had no clerk stamp or e-filing metadata, proving it had never been submitted. This demonstrated that Collins never prepared or filed a continuance motion for the March 7 hearing at all, leaving Plaintiff unprotected and unable to contest the fraudulent financial filings and ex parte orders that had already been entered against her.

298.   As a direct result of Defendant Collins's inaction, Plaintiff was forced into the March 7, 2025 hearing without preparation, without corrected financial documents, without the ability to challenge the false CS-41 affidavits filed under opposing counsel's credentials, and without any meaningful participation in the child-support determination. This compounded the constitutional violations already underway and left Plaintiff without representation at one of the most critical stages of her case.

**February 5–8, 2025 – Escalating Retaliation, Unauthorized Entry, Police Neglect, False Mental-Health Petition, Fabricated Criminal Charge, And Orchestrated Public Arrest**

*Early-Morning Property Destruction and Initial Police Neglect (Feb 5, ~1–2 AM)*

299.   At approximately 1–2 a.m. on February 5, 2025, while Plaintiff was upstairs in her studio workspace and her stepfather John was sitting on the couch inside Plaintiff's room due to Crystal's frequent nighttime episodes, Plaintiff's mother, Crystal, began violently striking Plaintiff's bedroom door with a hammer. Plaintiff and John were awake when Crystal repeatedly hit the door, creating multiple holes through the wood. Plaintiff contacted law enforcement, but officers declined to take action, stating they would not intervene because Crystal and John "owned the house," despite the clear destruction of Plaintiff's personal property and the escalating domestic disturbance.

*Unauthorized Access, Door Removal, and Violation of Protective Orders (daytime)*

53

300.    When Plaintiff left for work later that morning, her bedroom door was still attached but
        damaged and riddled with hammer holes. While Plaintiff was away, Crystal allowed
        Defendant Maxie into the home in violation of the Standing PDL Order and municipal
        no-contact restrictions. During this unauthorized entry, Crystal and Defendant Maxie
        removed Plaintiff's bedroom door entirely, including portions of the surrounding frame
        and Plaintiff's newly installed $80 keypad lock. Plaintiff later learned that Crystal
        allowed Defendant to take the keypad lock with him. Upon returning home, Plaintiff
        discovered that the entire door was missing, leaving her room exposed with no privacy or
        security. She recorded her discovery and confronted Crystal on video. The hammering
        incident, the police refusal to intervene, Crystal's unauthorized access granted to
        Defendant, and the removal of Plaintiff's door and lock all occurred just hours before
        Crystal began a series of retaliatory filings.

*Afternoon Intrusion and Police Refusal to Enforce Orders (Feb 5, later)*

301.    Later that same day, Crystal—who had a documented history of mental-health
        instability—entered Plaintiff's room uninvited despite police instructions requiring
        separation. Crystal again called law enforcement for no legitimate reason. Approximately
        fifteen minutes after Crystal entered the room, Plaintiff discovered Defendant Maxie
        inside the residence, standing on the stairwell with Crystal, in direct violation of the
        Standing PDL Order and the active no-contact restrictions in his criminal appeal cases.
        Plaintiff immediately ordered Defendant to leave and called law enforcement. Defendant
        exited the residence, parked across the street, and remained nearby with Crystal, while
        Kisha arrived and began speaking with officers, influencing their response.

302.    At least six Prattville officers, including the Chief of Police, responded. Plaintiff
        informed them of the active no-contact provisions associated with Defendant's criminal

appeals, explaining she had not been served with physical copies. Officers attempted to
search their system but stated they "could not locate" any no-contact order. Plaintiff then
referenced the Standing PDL Order from the parties' ongoing divorce case, which
expressly prohibits both parties from entering each other's residences, contacting one
another, or engaging in harassment directly or through third parties. When Plaintiff
attempted to show officers the exact language of the PDL Order on her phone, the
supervising officer refused to read it and repeatedly demanded whether Plaintiff had a
"no-contact order in hand." Despite Plaintiff pointing directly to the portion barring
Defendant from entering her home, officers declined to enforce it and allowed Defendant
to leave without consequence.

303.    This sequence demonstrates Defendant's continued violations of multiple court orders
and the ongoing refusal by law enforcement to enforce protections already in place.
Plaintiff was left in constant fear that Defendant could show up at any moment and that
officers would again refuse to protect her. This failure of enforcement deepened
Plaintiff's trauma, stripped her of safety within her own home, and underscored systemic
indifference to her rights and well-being.

*Retaliatory Mental-Health Petition and False Warrant Filing (Feb 5–6)*
304.    Later on February 5, Crystal went to the county mental-health office with Defendant
Maxie and filed a petition for involuntary commitment against Plaintiff, falsely claiming
Plaintiff was mentally unstable. Crystal had been participating in outpatient treatment
since December 2024. The petition explicitly listed Defendant as a witness, corroborating
his unauthorized presence at the residence earlier that day. This filing demonstrates
coordinated retaliation by Crystal and Defendant Maxie following Plaintiff's attempts to
enforce court orders.

305. On February 6, after being manipulated by Defendant Maxie with false claims that Plaintiff had filed a warrant against her, Crystal went and signed a warrant claiming Plaintiff assaulted her. Crystal did not understand the legal process and believed Defendant Maxie's false statements without question. When Plaintiff was later released from jail, Crystal showed her what she believed to be Plaintiff's "warrant" against her, which Plaintiff immediately recognized as nothing more than a police report from a previous family incident. The paper contained no signature, statement, or filing from Plaintiff, and Crystal admitted she misunderstood the document.

306. Additional evidence found on Crystal's phone confirmed that her therapist had been coaching her through the process and encouraging her to file the warrant. These messages show Crystal was influenced, manipulated, and guided into filing a retaliatory charge against Plaintiff. Officer B, a mental-health response officer, later acknowledged via text that Crystal had indeed signed a warrant but stated he held it temporarily in an effort to de-escalate family conflict.

307. Plaintiff, fearing additional retaliatory action, used what little money she had to secure a hotel room that night.

*Plaintiff's Arrest, Public Recording, and Prosecutorial Retaliation (Feb 8)*

308. Because Officer B did not work weekends, the warrant was formally processed on Saturday, February 8, and Plaintiff was arrested at her home while asleep. As Plaintiff was being arrested, Defendant Maxie was parked outside the residence recording the arrest from his vehicle, consistent with previous incidents where he parked in the same location. Shortly thereafter, the arrest video was posted on Facebook by Defendant's close associate, Hannah Delaney, with humiliating comments. Plaintiff reasonably

believes Defendant coordinated both the recording and public posting to shame and intimidate her.

309.   Plaintiff spent three days in jail despite the absence of evidence supporting the charge. After her bond was posted on February 10, she remained in custody for several additional hours before release without explanation. Upon release, officers escorted her home to ensure compliance with the no-contact order involving Crystal and confirmed Plaintiff was legally permitted to remain in the residence.

310.   Later that same day, Defendant Prosecutor Bradley Hawley—who was simultaneously prosecuting Defendant Maxie's domestic-violence appeals—filed a Motion to Revoke Plaintiff's bond in an unrelated Millbrook municipal case, attempting to use the fabricated Prattville assault charge to justify revocation. The cases involved different cities, different police departments, and unrelated incidents. The timing shows Hawley filed the revocation request immediately after Plaintiff's release, strongly indicating retaliatory motive. In contrast, despite multiple documented violations and domestic-violence convictions, Defendant Maxie never faced a single bond-revocation request while his appeals were pending. This disparate treatment highlights the systemic bias Plaintiff faced: while her abuser was shielded, Plaintiff was aggressively targeted based on fabricated accusations.

311.   Two days later, on February 12, Crystal was taken into custody for inpatient mental-health treatment following troubling communications between her and her counselor—several falsely accusing Plaintiff of criminal conduct in what appeared to be continued attempts to have Plaintiff charged or removed from the home. The charges Crystal filed against Plaintiff were later dismissed. These events show how Defendant Maxie

manipulated Crystal and weaponized legal and mental-health processes against Plaintiff,
while law enforcement repeatedly failed to enforce valid court orders, leaving Plaintiff
vulnerable and unprotected.

**February 19–20, 2025 – Prosecutor Interference and Attorney Withdrawal**

312.   On February 19, 2025, after weeks of attempting to reach him since Defendant Ahmaud
       Maxie's last appeal hearing on January 27, 2025, Plaintiff finally received a return call
       from Defendant Prosecutor Bradley Hawley regarding Defendant Maxie's criminal
       appeals in Elmore County (CC-2024-000638; 640).

313.   The call occurred in the early evening, around 5–6 p.m. Plaintiff explained that she had
       substantial evidence to provide for those appeal cases, and Defendant Hawley provided
       his correct email address, instructing her to send the materials directly.

314.   Plaintiff asked Defendant Hawley when the next court hearing was scheduled. Hawley
       stated that the next date was March 3, 2025, describing it as a plea date and advising that
       Plaintiff did not need to appear.

315.   During the conversation, Plaintiff expressed concern that Defendant Maxie's appeals
       were being intentionally delayed until after the March 7, 2025 final divorce hearing in
       Autauga County (DR-2024-900130).

316.   During that same call, Hawley told Plaintiff that her retained divorce attorney, Defendant
       Julia Collins, already had "paperwork ready to withdraw." At that time, no withdrawal
       motion had been filed or served. Hawley had no role in Plaintiff's divorce case and no
       lawful reason to access or discuss filings in that matter. His statement indicated
       unauthorized access to information outside his prosecutorial duties.

317.   Plaintiff, unaware of this and confused, questioned why Collins had not yet withdrawn
       after repeatedly ignoring Plaintiff's requests to file a motion to continue the final hearing

so she could gather evidence. Hawley replied that he was unsure but advised that if Plaintiff released Collins, the judge would likely have to grant a continuance so that she could find new counsel.

318.  Relying on that representation, Plaintiff emailed Collins immediately after the call, stating that she no longer needed representation. Within two hours of that email, Collins filed a motion to withdraw. The close timing of these events shows that Hawley was aware of Collins's intent to withdraw before Plaintiff had been notified, raising serious questions of improper communication between counsel and court officials and coordinated conduct that deprived Plaintiff of independent representation and fair process.

319.  On February 20, 2025, the next day, Judge Booth granted the withdrawal without a hearing, without ensuring substitute counsel, and without granting a continuance—leaving Plaintiff unrepresented for the March 7 hearing.

320.  Public professional records confirm that Defendant Collins was previously employed with the Prattville law firm Grainger, Hawley & Shinbaum, LLC, where Defendant Brad Hawley also practices.

321.  Both attorneys are listed at the same office address, 925 S. Memorial Dr., Prattville, AL 36067, in Avvo and Martindale legal directories. This prior affiliation establishes a pre-existing professional relationship between Plaintiff's former divorce counsel and the prosecutor who later handled both Plaintiff's and Defendant Ahmaud Maxie's criminal matters.

322.  Their undisclosed connection, coupled with the timing of Collins's withdrawal and Hawley's advance knowledge of it, creates the appearance of coordinated conduct and a

conflict of interest that directly compromised Plaintiff's right to due process and impartial

prosecution.

**Discovery of Attorney's Arrest and Lack of Notice of March 7 Hearing**

323.   While preparing appeal materials, Plaintiff discovered publicly available news reports

showing that her former attorney, Defendant Julia Collins, had been arrested by

Defendant Judge Booth in 2017.

324.   This revelation explained Collins's deferential behavior toward Booth and the systemic

bias Plaintiff experienced throughout the divorce proceedings.

325.   At this point Plaintiff remained uncertain whether the final divorce hearing, originally

scheduled for March 7, 2025, was still set to proceed. No party or clerk confirmed any

date after Collins's withdrawal.

326.   Plaintiff later discovered that on March 6, 2025, Defendant Judge Booth issued an Order

Confirming the Final Hearing for March 7, 2025. Plaintiff was never served with that

order and therefore had no notice that the hearing would proceed.

327.   Deprived of counsel and notice, Plaintiff was denied a meaningful opportunity to be

heard. Despite her pending requests for additional time to obtain representation and

evidence, the Court proceeded with the March 7 hearing and dismissed the case entirely,

leaving custody, financial, and property issues unresolved.

**March 2, 2025 – Retaliatory Arrest of Plaintiff's Stepfather John**

328.   On February 7, 2025, Plaintiff's stepfather John was arrested following an incident in

which Plaintiff's mother, Crystal, called Defendant Maxie during an argument. Defendant

Maxie then contacted law enforcement, resulting in John's arrest. This arrest created an

active bond for John that prosecutors later targeted.

329.   The following day, February 8, 2025, Plaintiff herself was arrested on the retaliatory
       warrant Crystal had signed under Defendant Maxie's manipulation. Both Plaintiff and
       John now had active cases that prosecutors could weaponize through bond-revocation
       attempts.

330.   Around this same time, efforts began to revoke John's bond based on an entirely separate
       Elmore County case dating back to June 3, 2024—a case in which no new violations had
       occurred.

331.   Plaintiff's mother, Crystal, remained in an inpatient mental-health facility from February
       12 through March 1, 2025. During her stay, Crystal left her vehicle with the Maxie
       family. Upon her discharge on March 1, she retrieved the vehicle and then disappeared
       unexpectedly the following day without notifying Plaintiff or John.

332.   On the evening of March 2, 2025, Plaintiff and John went to Ulta in Prattville while
       attempting to locate Crystal. While Plaintiff was checking out at the register, a police
       officer approached her, triggering immediate fear that she was being arrested again due to
       the ongoing pattern of retaliation.

333.   Plaintiff soon learned the officers were actually there for John. When she exited the store,
       John was already handcuffed in the back of a patrol vehicle. Plaintiff requested to retrieve
       his truck keys before officers transported him.

334.   Plaintiff questioned whether John was being arrested without a confirmed warrant.
       Officers admitted that while John "had a warrant," it "had not been transferred yet" from
       Elmore County to Autauga County. They stated that if the warrant did not arrive within
       approximately ten minutes, they would be required to release him.

335. Officers remained parked directly behind Plaintiff's vehicle, preventing her from leaving, while they waited for the warrant transmission. Plaintiff and John were forced to remain in the parking lot during this period, with John still restrained in the patrol car.

336. When the warrant finally transmitted, officers informed Plaintiff that John would be transported to the Elmore County Jail. John was taken into custody and remained incarcerated for over a month.

337. The circumstances of John's arrest—including detaining him before warrant confirmation, waiting for inter-agency paperwork while holding him in restraints, and the timing immediately after Crystal's release—mirror the retaliatory tactics used against Plaintiff on February 10, 2025.

338. These events demonstrate a coordinated pattern targeting Plaintiff's entire household. The same officials who retaliated against Plaintiff used identical methods—bond revocations, delayed releases, mid-process warrant execution, and cross-county cooperation—to target John as well.

339. This pattern shows systemic misuse of criminal procedures to intimidate and destabilize Plaintiff and anyone associated with her.

**Final Hearing and Immediate Aftermath**

340. Following the hearing, Defendant Maxie boasted about the proceeding, sending Plaintiff a text message stating, "We are divorced."

341. That same day, Defendant Maxie publicly posted on Facebook: "As of today, I AM DIVORCED," followed by celebratory emojis.

342. In the comment thread, Defendant Maxie added, "I skipped out the courtroom," to which friends and acquaintances responded with congratulations and laughing reactions.

343. These communications demonstrate Defendant Maxie's disregard for the seriousness of the proceedings and confirm Plaintiff's allegation that the hearing and resulting judgment were tainted by irregularity and bias.

344. By dismissing the case under these circumstances, the Court deprived Plaintiff of due process, ignored material evidence, and allowed Defendant Maxie to continue weaponizing the legal process while publicly humiliating Plaintiff.

345. Although Plaintiff was pro se after February 20, 2025 and entitled to direct service of all filings, she was never served with the March 6 Order, the March 7 Order, or the March 14 Final Decree of Divorce.

346. On March 8, 2025—the day after the final divorce hearing—Defendant Maxie publicly announced his relationship with Madison Evans on social media, posting photos and making the relationship "official." Evidence stored on Plaintiff's phone confirms that Maxie and Evans had been romantically involved since late January or early February 2025, while the divorce was still pending.

347. Defendant's concealment of this relationship during litigation, followed by his celebratory announcement immediately after the hearing, illustrates his pattern of deceit, retaliation, and public humiliation of Plaintiff.

348. This relationship later became the subject of criminal proceedings when Defendant Maxie was arrested on September 3, 2025, under case number MC-2025-900061.00 (City of Millbrook v. Maxie Ahmaud Deandre) for Domestic Violence 3rd – Harassing Communications. The listed prosecutor was Bradley Allen Hawley (bhawley@graingerhawley.com) of Grainger, Hawley & Shinbaum, LLC—the same prosecutor who had previously handled both Plaintiff's and Defendant's related criminal

63

matters and had interfered in Plaintiff's divorce proceedings earlier that year. This overlap demonstrates an ongoing conflict of interest and systemic bias across Plaintiff's intertwined criminal and family-court cases.

349.    Evidence later obtained by Plaintiff—including text messages and photographs exchanged with Madison Evans—confirmed that Defendant Maxie's manipulation, threats, and physical abuse extended beyond the marriage. Evans described multiple incidents of emotional and physical abuse, further corroborating Defendant's violent behavior and the systemic failure of law enforcement and prosecutors to intervene despite repeated warnings and arrests.

350.    On March 22, 2025, Defendant Maxie personally delivered the Final Decree to Plaintiff's residence. Surveillance footage shows him walking to the mailbox, opening it, and inserting the court order. This conduct confirmed that the Court and opposing counsel failed to properly serve Plaintiff and also constituted unlawful tampering with U.S. mail.

351.    Plaintiff only received the decree because of Defendant's self-help delivery. By bypassing lawful service, the Court deprived Plaintiff of notice, the ability to file post-judgment motions, and the right to timely appeal, compounding the due-process violations surrounding the March 7 hearing.

352.    The Final Decree falsely recited that Plaintiff had "abandoned" the children and left them with Defendant for a "significant period of time."

353.    This accusation first appeared months earlier in Judge Booth's November 12 and November 14, 2024 orders, despite the absence of any evidence or hearing supporting such a finding.

64

354.    The repetition of this language in the March 14, 2025 decree reflects a deliberate pattern
        of misrepresentation intended to damage Plaintiff's credibility and parental rights.

355.    The repeated use of false "abandonment" findings in the November 12, November 14,
        and March 14 orders demonstrates a pattern of unlawful judicial retaliation designed to
        punish Plaintiff rather than reflect facts or law. D. Post-Judgment Discovery of Additional
        Conflicts

**May–October 2025 – Contempt Proceedings, Retaliation, And Final Loss Of Housing**

356.    After the March 14, 2025 decree, Defendant Maxie continued a pattern of intentional
        financial abuse and neglect. Bank and social-media records show regular income and
        high-value purchases contradicting his claims of hardship, while he ignored the
        November 14, 2024 order requiring removal of Plaintiff's name from the marital Ford
        Explorer. His refusal left Plaintiff financially liable for the debt and without
        transportation to maintain employment or provide consistent stability for the children.
        These acts reflect ongoing retaliation and bad-faith defiance of court orders, causing
        continued economic loss and emotional distress to Plaintiff and harm to the children's
        welfare.

357.    On May 27, 2025, Plaintiff filed a Petition for Contempt in Elrod v. Maxie (DR-2025-
        900097.00), alleging violations of

358.    the July 9, 2024 order prohibiting further joint-credit-card charges and

359.    the November 14, 2024 order requiring removal of her name from the 2017 Ford
        Explorer.

360.    The petition cited text messages from January 2025 in which Defendant Maxie
        conditioned compliance on Plaintiff "dropping the charges" on his pending appeal cases

65

at the time, along with lender and counsel communications confirming continued non-compliance.

361.  Defendant Maxie was personally served certified mail on May 28, 2025.

362.  On May 29, 2025, Judge Patrick Pinkston granted Plaintiff's Affidavit of Substantial Hardship, waiving court costs.

363.  When no hearing was set for the contempt complaint, Plaintiff filed a Status Update on June 19, 2025 but still did not receive any update.

364.  On July 4, 2025, she filed an Application for Default (reciting the May 28 service date) and a Rule 70 Motion to authorize a substitute signature for removal of her name from the vehicle loan.

365.  July 9, 2025, Clerk Debra Hill inexplicably entered a notation claiming the defendant's service address was "non-existent." This contradicted Plaintiff's proof of service and the process server's sworn return confirming delivery at 6928 Wendover Way, Montgomery, AL 36117—an address where Plaintiff herself had previously lived and personally received mail during the marriage. The claim that the address "did not exist" was patently false and served only to create a pretext to erase valid service and delay enforcement.

366.  In response, Plaintiff filed a Motion for Alternate Service on July 10, 2025, re-verifying the correct address and providing an alternate business address (the Maxie family's bail-bond office in Prattville) to eliminate any possible excuse regarding service.

367.  On July 18, 2025, defense counsel Trey Norman filed a limited appearance and a motion to strike Plaintiff's default, alleging defective service and improper case numbering.

368.  Plaintiff promptly filed an Objection and Demand for Default (July 19), documenting the
      valid May 28 service and explaining that the new DR case number was assigned at the
      clerk's instruction.

369.  On July 25, 2025, Judge Patrick Pinkston transferred the case to Judge Joy Pace Booth—
      the same judge who had presided over Plaintiff's divorce, issued the orders being
      violated, dismissed that case on false "abandonment" findings, handled Defendant
      Maxie's related criminal appeals, and was the subject of Plaintiff's pending judicial-
      misconduct complaint. Booth's reassignment to yet another case involving the same
      parties—particularly one alleging violations of her own prior rulings—constituted a
      direct conflict of interest and destroyed any appearance of judicial impartiality.

370.  Evidence later confirmed that Defendant Maxie intentionally returned court mail marked
      "address does not exist," despite having received the certified service on May 28, 2025,
      at a valid, occupied address—6928 Wendover Way, Montgomery, AL 36116. Postal
      notations and the court's own docket entries reflected mail being returned from that same
      address, showing a deliberate effort by Defendant to create the false appearance of
      defective service.

371.  This manipulation directly caused the clerk's July 2025 notation that service was "non-
      existent," which contradicted the process server's sworn proof of delivery. By
      manufacturing a false record of failed service, Defendant obstructed enforcement of prior
      court orders, delayed contempt proceedings for months, and ensured that Plaintiff's
      default and Rule 70 motions would not be heard.

372.  Despite Plaintiff's multiple filings correcting the record and providing alternative
      addresses—including the Maxie family's bail-bond office in Prattville—the Court failed

to address the misconduct or reinstate service validity, allowing Defendant to benefit from his own deceptive acts and continue violating financial and vehicle-title orders without consequence.

**July–October 2025 – Alabama State Bar Prosecutorial Misconduct Complaint and Dismissive Outcome**

373.   On July 18, 2025, Plaintiff mailed a formal Prosecutorial Misconduct Complaint to the Alabama State Bar against Millbrook City Prosecutor Bradley Allen Hawley, outlining a clear pattern of conflicts of interest, selective enforcement, and retaliation arising from his simultaneous prosecution of Plaintiff while representing the City in her abuser Ahmaud Maxie's domestic-violence appeals.

374.   The complaint, originally drafted in June 2025, described in detail Hawley's February 19, 2025 phone call advising Plaintiff to release her divorce attorney under the false pretense that the judge would be required to grant a continuance. That advice directly resulted in Plaintiff appearing unrepresented at trial and losing custody of her children. It also outlined Hawley's refusal to act on the flash drive containing video evidence of intoxicated driving and abuse, his disregard of multiple no-contact violations, and his pattern of minimizing the conduct of the offender while aggressively targeting the victim.

375.   Plaintiff's complaint included extensive supporting exhibits—digital evidence, police reports, PFA-violation documentation, and written correspondence—and cited violations under Marsy's Law, the Alabama Crime Victims' Rights Act, and Rules 3.8 and 8.4 of the Alabama Rules of Professional Conduct.

376.   She detailed how Hawley ignored domestic-violence evidence, failed to prosecute felony-level offenses under HB-76 involving pregnancy and strangulation, and allowed serious charges to be downgraded to misdemeanors through deliberate neglect. The complaint

requested a full ethics investigation, review of dismissed domestic-violence cases, Hawley's removal from any future proceedings involving Plaintiff, and disciplinary sanctions to prevent further harm to other victims.

377.   On October 28, 2025, Plaintiff received an email from the Office of General Counsel of the Alabama State Bar referencing CSP No. 2025-729 and acknowledging review of her complaint. The correspondence stated that two attorneys in the Office of General Counsel had reviewed the materials and the attorney's response, and that "in view of the nature and content of the documents reviewed, a determination has been made that no further action will be taken in the matter at this time."

378.   The dismissal occurred without any interview, follow-up, or opportunity for Plaintiff to provide clarification or additional evidence. This perfunctory resolution mirrored the Judicial Inquiry Commission's premature rejection of her judicial complaint, reinforcing a broader pattern of institutional indifference and protectionism that has characterized every oversight body involved in her pursuit of accountability.

**August 4–11, 2025 – Judicial and Prosecutorial Misconduct Filings & Dismissive Response**

379.   On June 3, 2025, Plaintiff filed a Judicial Misconduct Complaint with the Alabama Judicial Inquiry Commission against Judge Joy Pace Booth. The Commission issued an acknowledgment letter dated June 5, 2025, confirming receipt of the complaint dated June 4, 2025, and stating that the matter would be presented to the members of the Commission for review at their next scheduled meeting, which occurs approximately every eight weeks. The acknowledgment assured Plaintiff that her complaint would receive serious consideration and that she would be notified once final action was taken.

380.   Two days later, on June 5, 2025, Plaintiff mailed a respectful letter to Judge Booth at the Autauga County Courthouse. The letter expressed the devastating impact of Booth's prior

69

rulings on Plaintiff's life and children, describing her loss of housing, transportation, and stability. It was not a threat or act of disrespect—it was a protected First Amendment

381. On August 11, 2025, the Commission mailed Plaintiff a second letter acknowledging that her supplemental packet was received that same day, returning it to her unopened while enclosing the pre-dated August 8 dismissal letter. The timing and sequence of correspondence confirmed that the Commission's decision had already been made prior to receiving Plaintiff's updated filing, proving that her supplement was never reviewed. The premature dismissal and return of her submission without consideration deprived Plaintiff of a fair review of her judicial-misconduct complaint and illustrated the broader pattern of procedural indifference and institutional protectionism that she continues to face across Alabama's judicial oversight system.

382. On September 12, 2025, Norman sent a letter threatening "felony charges" over Plaintiff's withdrawal from a joint Guardian Credit Union account, despite her equal rights as joint owner. Plaintiff's September 16, 2025 reply noted her lawful access and pointed to Defendant's refusal to remove her from the $20,000 Explorer loan.

383. On September 19, 2025, Norman filed an "Emergency Motion for Contempt," alleging Plaintiff "stole" Defendant's tax refund while omitting that deposits exceeded $10,000 and that the account remained joint at Defendant's insistence. Judge Booth set a hearing for October 2, 2025, expediting Defendant's motion while Plaintiff's own default applications remained unresolved.

384. On September 3, 2025, Defendant was arrested in Millbrook (MC-2025-900061.00) for Domestic Violence 3rd—Harassing Communications against Madison Evans. Despite

repeated arrests and harassment, local courts and prosecutors continued to minimize his conduct.

**September 2025 – Eviction Proceedings in Autauga County**

385. In August 2025, Plaintiff's mother and stepfather, Crystal and John Robbins, filed an unlawful-detainer action, Robbins v. Elrod (DV-2025-900368.00), in Autauga District Court before Defendant Judge Jessica K. Sanders. Plaintiff was not a tenant, had no lease, and paid no rent, yet the case was processed using Alabama Uniform Residential Landlord–Tenant Act forms, procedures, and deadlines.

386. On August 28, 2025, Plaintiff discovered the unlawful-detainer summons taped to her door while retrieving a food delivery. It was never mailed or personally served, making service defective.

387. On August 29, 2025, Plaintiff timely filed an Answer and Motion to Dismiss with Exhibits A–I (utility bills, food receipts, text messages, Venmo payments, and vehicle-related receipts), denying any landlord-tenant relationship and documenting Plaintiffs' transportation sabotage, which impaired Plaintiff's ability to move.

388. On September 17, 2025, Judge Sanders entered judgment for possession on behalf of Crystal and John Robbins. The judgment referenced "rent" of $5,400 despite there being no lease, no rent obligation, and no money judgment entered.

389. During the hearing, John Robbins told Judge Sanders that Plaintiff "originally came to stay because she was hiding out from her abusive ex." Despite this admission that Plaintiff was a domestic-violence survivor seeking refuge, Judge Sanders processed the matter as a landlord-tenant eviction. Misclassifying a DV survivor and enabling the use of eviction procedures to expel her from a place of safety deprived Plaintiff of due process and violated the Fair Housing Act's protections against sex-based discrimination.

71

390.   This treatment also violated Alabama's anti-retaliation statute, Ala. Code § 35-9A-141, which protects individuals from being penalized for seeking safety or assistance in domestic-violence situations.

391.   That same day, Plaintiff filed a Motion to Reconsider, raising substantial due-process violations: application of the wrong statutory scheme (URLTA applied to a non-tenant), shifting the burden of proof onto Plaintiff, raising unpled legal theories (trespass, ejectment, FED), excluding Plaintiff's exhibits, and proceeding despite defective service.

392.   Plaintiff's witness, Christina Patterson, was present and prepared to testify that Plaintiff was treated as family—not as a tenant—and that John Robbins acted out of retaliation. Judge Sanders dismissed Christina after asking a single improper question—"Do you have proof she should not be evicted and able to stay in the house?"—which misstated the legal standard and flipped the burden entirely onto Plaintiff. This refusal to hear testimony denied Plaintiff her right to present a defense.

393.   The Court also allowed Plaintiffs to inject irrelevant and inflammatory allegations about Plaintiff's children after John Robbins stated that Plaintiff had "left her children," referencing an unrelated incident from November 2024. Rather than strike the comment, Judge Sanders began questioning Plaintiff about custody issues—matters wholly outside the scope of an unlawful-detainer action. This demonstrated bias, judicial hostility, and reliance on prejudicial information unrelated to the claims.

394.   During the same hearing, Judge Sanders engaged in visible coercion toward Plaintiff's mother, Crystal Robbins. When Crystal hesitated to agree that she wanted Plaintiff removed, Judge Sanders nodded when Crystal leaned toward "yes" and shook her head when Crystal leaned toward "no." Under this pressure, Crystal ultimately agreed on the

record despite her hesitation and body language clearly showing she did not

independently want Plaintiff evicted. This conduct manufactured consent, influenced

witness testimony, and deprived Plaintiff of a neutral decision-maker.

395.   On September 18, 2025, Judge Sanders summarily denied Plaintiff's Motion to

Reconsider and Motion to Stay as "without legal merit," without addressing the due-

process violations raised.

**September 24, 2025 – Appeal Bond Order and Procedural Manipulation**

396.   On September 24, 2025—before Plaintiff's corrected appeal was processed and while her

hardship affidavit remained unaddressed—Judge Sanders advanced the filing to circuit

court and entered an order at 3:37 p.m. setting a $1,000 appeal bond. Within

approximately thirty minutes, Plaintiff received verbal notice that the bond had to be paid

by 8:30 a.m. the following morning, although no such deadline appeared in the written

order. This imposed an impossible deadline and effectively bypassed Plaintiff's indigency

request.

397.   At 4:08 p.m. the same afternoon, Plaintiff received a voicemail from the District Court

stating:

*"Hello, this message is for Kelsie Elrod. Judge Sanders has set your appeal bond in the
amount of $1,000. It should be paid by 8:30 tomorrow morning."*

398.   Plaintiff did not see the missed call or voicemail until around 6:00 p.m., after she had

already begun correcting her appeal filings through AlaFile.

399.   That evening, a sheriff arrived at Plaintiff's residence accompanied by John Robbins.

John unlocked Plaintiff's door and entered the premises without her awareness while she

was wearing noise-canceling headphones. The sheriff delivered a printed copy of the

bond order. The physical copy contained a handwritten note—"Appeal bond must be paid

by 8:30 A.M. on 9-25-25"—which was not part of the official record. Upon information and belief, John Robbins wrote the handwritten deadline himself, as he possessed the order before Plaintiff received her own copy through AlaFile.

400.   Plaintiff never received any official written court order stating that a $1,000 appeal bond was required to be paid "by 8:30 A.M." on September 25, 2025. The written bond order uploaded to AlaFile contained no deadline, no payment time, and no instruction requiring same-day or next-morning compliance. No written notice of any deadline was ever issued through the clerk, AlaFile, or by personal service.

401.   The only notice of an alleged 8:30 A.M. deadline came from the voicemail left at 4:08 p.m. on September 24, 2025—after business hours and with less than sixteen hours of possible response time. Alabama law requires that appeal-bond conditions be stated in a written order; a voicemail from court staff does not satisfy the constitutional requirement of clear, written notice. Without a written deadline, Plaintiff had no meaningful opportunity to comply, challenge, or seek modification under Rule 62 or *§12-12-70.*

402.   The handwritten notation stating "Appeal bond must be paid by 8:30 A.M. on 9-25-25" was not part of any official order filed by Judge Sanders. It was unsigned, undated, and added by a private individual—John Robbins—before Plaintiff received her own copy through AlaFile. This unauthorized addition fundamentally altered the terms of a judicial order and created an unlawful, false deadline that deprived Plaintiff of due process and the ability to meaningfully access appellate review.

403.   The combination of an off-record verbal directive from the court, an unauthorized handwritten addition, and physical delivery of an altered order created confusion, intimidation, and a false sense of urgency. Plaintiff was given less than sixteen hours to

obtain funds she did not have. This irregular and coercive enforcement reflects a breakdown of procedural integrity and due-process protections.

404.   Despite these barriers, Plaintiff finalized and filed her corrected appeal packet in District Court that night, including a renewed hardship affidavit, a statement of irregularities, and a motion to stay the $1,000 bond based on indigence.

405.   During this same period, Judge Joy Pace Booth continued to be assigned to overlapping matters involving Plaintiff and Defendant Maxie—presiding over Plaintiff's domestic filings, Defendant's criminal appeals across two counties, and as of September 24, 2025, Plaintiff's eviction appeal—creating an appearance of bias and conflict.

**September 24–26, 2025 – Ex Parte Influence, Collusion, and Defamatory Order**

406.   On September 24, 2025, Defendant Judge Jessica Sanders entered an order in Robbins v. Elrod stating:

*"The Court is unsure if the pro se Defendant is using artificial intelligence to assist in drafting her motions or if she is suffering from some mental infirmity."*

407.   This remark had no basis in evidence, bore no relevance to the issues before the court, and served only to ridicule, discredit, and publicly stigmatize Plaintiff.

408.   Two days prior, Plaintiff's mother and stepfather visited Gus Affordable Bail Bonds—a business owned and operated by family members of Plaintiff's abusive ex-husband, Defendant Ahmaud Maxie. John Robbins had never previously interacted with Gus Maxie or his business, making this sudden visit highly irregular.

409.   Upon information and belief, John Robbins disclosed to the Maxie family that Plaintiff had been using AI technology in her legal filings and repeated defamatory claims that Plaintiff "needed mental help." Within forty-eight hours, Judge Sanders issued an order

containing those same private accusations verbatim, indicating that the information had
been improperly relayed to the judge through off-record ex parte communication.

410.    The sequence of events demonstrates collusion between private parties and judicial
actors. Personal gossip about Plaintiff's mental state and use of AI appeared directly in a
public court order. This conduct reflects retaliation for Plaintiff's protected legal activity,
denial of impartial adjudication, and defamation under color of state law, in violation of
the First and Fourteenth Amendments and 42 U.S.C. § 1983.

**October 2, 2025 – Retaliatory Contempt Hearing and Due-Process Violations**

411.    Following months of non-enforcement of prior court orders, the contempt proceedings
between May and October 2025 evolved into a pattern of retaliation and humiliation
against Plaintiff.

412.    The case was initially assigned to Judge Patrick D. Pinkston, who accepted Plaintiff's
Affidavit of Substantial Hardship. When no action followed, Plaintiff filed a Motion for
Status Update (June 19, 2025), a Motion for Default Judgment (July 4, 2025), and a Rule
70 Motion seeking enforcement of the title-transfer order. On July 9, 2025, the Court
entered a notation claiming service had failed due to a "nonexistent address." The matter
was subsequently transferred to Judge Booth.

413.    At an August 25, 2025 setting, defense counsel told Defendant, "You can't just send
things back saying the address doesn't exist," to which Defendant replied, "Yes, sir,"
effectively admitting notice. Judge Booth set a trial date for October 6, 2025 and directed
the parties to "try to work something out."

414.    Plaintiff never heard from opposing counsel again. Instead, on September 19, 2025,
Defendant filed a Cross-Motion for Contempt alleging that Plaintiff wrongfully withdrew
approximately $7,000 from a joint Guardian Credit Union account containing his 2024

tax refund. That account was jointly owned. Plaintiff lawfully accessed the funds, leaving several thousand dollars in the account, and used a portion to pay debts in her name and to attempt to purchase a vehicle after months without transportation.

415.    Without prior consultation, Judge Booth issued an "Emergency Setting" scheduling a hearing on Defendant's motion for October 2, 2025—four days before Plaintiff's own contempt trial—allowing Defendant to present his accusations first while delaying enforcement of his prior violations.

416.    At approximately 8:00 a.m. on October 2, 2025, Plaintiff appeared before Judge Booth carrying $5,000 in cash (the disputed funds), prepared to return them if required. Judge Booth began the proceeding by telling Defendant Maxie's counsel, "Alright Trey, you first, since you're the one who filed this." Norman then launched into a lengthy narrative that went well beyond the pleadings, reviving irrelevant matters from the prior divorce case (DR-2024-900130), including Plaintiff's private letter from November 14, 2024— none of which related to the motion before the Court.

417.    Norman accused Plaintiff of "stealing" the refund and preventing closure of joint accounts because her name remained on the Guardian account, the credit card, and the vehicle loan. He asserted Defendant could not refinance the Explorer because it was "too far upside down" and portrayed Plaintiff as deliberately non-compliant regarding child support and debt obligations. He then urged the Court to disregard Plaintiff's filings in her own pending contempt action (DR-2025-900097), claiming lack of service, and to proceed only on Defendant's motion—effectively erasing Plaintiff's five-month-old enforcement case.

77

418.    When given the opportunity to respond, Plaintiff explained that she was a lawful joint
account holder and withdrew a portion of the funds to pay down personal debt and to
secure transportation after Defendant's noncompliance left her stranded. She emphasized
that Defendant and his counsel had threatened her with "warrants," "felony charges," and
"federal filings," even though her actions were legal and routine.

419.    After Plaintiff explained her lawful use of the joint account, the Judge's questioning
shifted from procedural to personal. Judge Booth demanded to know how Plaintiff
arrived at court without a vehicle and repeatedly pressed for the full name of the friend
who drove her ("Christina who?"). Plaintiff intentionally withheld the friend's last name
because the individual had no involvement in the litigation and was entitled to privacy.
Plaintiff maintained composure by acting as though she could not recall the last name to
avoid dragging an uninvolved person into the proceeding. Rather than respecting this
boundary, Judge Booth mocked Plaintiff and treated the moment as evidence of
instability, despite it having no relevance to the issue before the Court.

420.    During this exchange, Defendant Maxie's attorney referenced Plaintiff's emotional state
from November 11, 2024—the day she left the marital residence after prolonged abuse—
and used that moment of trauma to imply instability. Counsel stated: "I don't know
Judge... she seems better today. I'm not sure if she's seeing a therapist or what, but she
seems fine today." His remarks compared Plaintiff's demeanor in an abusive environment
a year earlier to her calm presentation in court on this unrelated matter, improperly
suggesting mental-health concerns and creating a pretext for heightened judicial scrutiny.

421.    The Judge later stated, "I can tell you're acting different." When Plaintiff replied, "You
don't even know me," Judge Booth responded, "Oh, I know you enough to know you're

acting different. I've seen your letters. Don't think that I haven't and you better be glad I didn't get you for a threat." Those "letters" were correspondence Plaintiff had sent months earlier on June 5, 2025—after the divorce case and Defendant Maxie's appeals had been dismissed—when Judge Booth was no longer assigned to any of Plaintiff's matters. The letters expressed concern over judicial conduct but contained no threats. Her unsolicited reference to them during a separate case demonstrated personal bias and retaliation for Plaintiff's protected speech.

422.   Judge Booth next ordered Plaintiff to immediately return the $5,000 she brought to court, depriving her of the funds she needed to purchase a vehicle that day. Moments later, Judge Booth abruptly declared, "I can drug-test anybody I want to in this court," and ordered a drug test even though no pleading raised any issues involving custody, visitation, substance use, safety concerns, or any matter that could make drug testing legally relevant. The drug test served no judicial purpose and functioned solely as a tool of intimidation and humiliation.

423.   By excusing Defendant's violations while imposing arbitrary and irrelevant sanctions on Plaintiff, the Court denied procedural due process and equal protection. Judge Booth's comments and actions—especially her reference to Plaintiff's private letters from a closed case and her decision to order an unrelated drug test—demonstrate bias, retaliation, and abuse of authority in violation of Plaintiff's clearly established rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983.

**October 6, 2025 – Retaliatory Dismissal Despite Filed Continuance**

424.   On October 3, 2025, opposing counsel's office (Jim T. Norman III) emailed Plaintiff to advise that Mr. Norman would be "a little late to the hearing" because he had another case in Elmore County that morning and that "Judge Booth is aware."

425.    On October 6, 2025, Plaintiff confirmed she was not refusing to appear and attempted to reach the court. At 9:17 a.m., she confirmed she had spoken with the clerk at 8:48 a.m. and reiterated that the situation was a transportation emergency outside her control.

426.    At approximately 8:45 a.m., that same morning, Plaintiff telephoned the Autauga County Clerk's Office to report her transportation emergency and confirm that she was not refusing to appear. Defendant Debra Hill answered the call. Plaintiff identified herself and explained: "I have a final contempt hearing this morning, but my ride fell through. I've called her repeatedly, and no one else I know can help last minute. I wanted to let the court know and ask if you need the case number."

427.    Hill paused and replied, "Mhm. It's set for final hearing this morning." Plaintiff reiterated that she was doing everything possible to get there and had checked Uber, but the fare was over $40 at the time. Plaintiff explained she simply did not have the funds for that price, especially at short notice. The amount was unusually high—likely because of morning traffic and limited availability—and Plaintiff emphasized that she was not refusing to appear, she simply could not physically get there. Hill responded, "Mhm… you can get an Uber." When Plaintiff again explained that she did not have the funds, Hill abruptly ended the call, stating, "Okay, well good luck to you," and hung up.

428.    Hill's response was dismissive and obstructive. By refusing to document Plaintiff's call, transfer her to a judicial assistant, or otherwise relay her explanation to the Court, Hill directly contributed to the ensuing dismissal for "failure to appear." Her conduct denied Plaintiff meaningful access to the courts and violated her rights to due process under the Fourteenth Amendment.

429.   After the call, Plaintiff attempted to file a Motion to Continue through Alabama's e-filing system to formally document the transportation emergency. The hearing was scheduled for 8:30 a.m., and opposing counsel had already advised both parties that he would be "a little late" because of another case in Elmore County. Despite these circumstances, the Court entered a Final Judgment of Dismissal at 10:07 a.m. on October 6, 2025, barely ninety minutes after the hearing time. The order—signed by Judge Joy Pace Booth and electronically filed by Clerk Debra Hill—dismissed the case for "failure to appear" and falsely recited that Plaintiff "was acting as if under the influence," "failed for numerous substances," "was unemployed," and "did not know the last name" of her driver. None of these assertions had any connection to the proceeding, nor were they supported by evidence in the record.

430.   The dismissal order inserted defamatory statements that were irrelevant to the proceeding, unsupported by sworn testimony, and drawn from personal impressions unrelated to the underlying motion. No evidentiary basis existed for the claims about "substances," Plaintiff's employment, or Plaintiff's demeanor. These gratuitous statements confirm that the dismissal was retaliatory, punitive, and motivated by Plaintiff's prior judicial-misconduct complaint, rather than by any lawful judicial purpose.

431.   The sequence of events—the prior notice that counsel would be late, Plaintiff's verified attempts to contact the court, and the immediate entry of a defamatory dismissal—demonstrates retaliation, judicial bias, and deprivation of due process under the Fourteenth Amendment.

**October 2025 – Enforcement of Writ of Possession and Final Loss of Property**

432.    On October 14, 2025, following months of judicial retaliation and procedural abuse,
        Plaintiff suffered the complete loss of her remaining belongings and stability. After Judge
        Sanders's wrongful eviction ruling and Judge Booth's October 2 order requiring Plaintiff
        to surrender her only available funds, Plaintiff was left without transportation, housing
        options, or financial means to relocate.

433.    That morning, Plaintiff's stepfather, John Robbins, contacted the sheriff's department to
        enforce the writ of possession previously issued in the eviction case. Deputies arrived at
        approximately 10:00 a.m., forcing Plaintiff to vacate immediately without adequate time
        or resources to remove her property. Most of her belongings—including her children's
        photographs, clothing, cleaning equipment, and personal effects—were discarded or
        withheld.

434.    This second displacement, almost exactly one year after Plaintiff lost her marital home
        under Booth's orders, marked the full collapse of Plaintiff's livelihood and security. It
        was the foreseeable and direct result of the compounded judicial misconduct by Judges
        Booth and Sanders, whose unlawful rulings stripped Plaintiff of due process, housing,
        income, and property.

435.    By October 2025, Plaintiff had been rendered homeless for the second time in a year—
        not by circumstance, but by the coordinated failures of the very officials sworn to uphold
        justice. Plaintiff maintains extensive documentation supporting every factual statement
        contained herein, including photographs, videos, certified court records, text messages,
        emails, and correspondence with officials. This evidence will be produced in discovery or
        upon the Court's request and leaves no genuine dispute as to the accuracy of Plaintiff's
        account.

**FINAL SECTION – Pattern of Coercive Control, Fraud, and State-Enabled Abuse Demonstrated Through the Madison Evans Incident**

436.    After the Plaintiff's separation from Defendant Ahmaud Maxie, the same patterns of

coercive control, manipulation, property interference, intimidation, and domestic violence

that the Plaintiff reported continued with another woman, Madison Leigh Evans. These

events occurred while Defendant was out on bond, under active criminal cases, under

court orders, and fully known to the same municipal agencies, magistrates, clerks, and

prosecutorial offices involved in the Plaintiff's matters. Ms. Evans's experience

demonstrates that Defendant's conduct was neither isolated nor unique to the Plaintiff; it

reflects a repeat pattern enabled by the same governmental inaction that ignored the

Plaintiff's warnings and constitutional rights.

437.    At the time Ms. Evans became involved with Defendant, the Plaintiff and Defendant

remained co-owners of a jointly-titled 2017 Ford Explorer. Despite having no legal

authority to transfer ownership, Defendant presented the jointly-titled vehicle to Ms.

Evans as if it were his personal property. He told her she could "have" and drive the

vehicle if she allowed him to obtain a boat, encouraging her to sell her own vehicle.

Unaware of the legal impossibility of transferring the Explorer into her name, Ms. Evans

sold her personal car, provided the proceeds to Defendant, and he purchased a

recreational boat for himself with her money.

438.    Following the boat purchase, Defendant and Ms. Evans separated due to Defendant's

infidelity. Despite this separation, Defendant continued using the jointly-titled vehicle as

a tool of control, telling Ms. Evans she could continue driving it if she made payments.

Unaware that the Plaintiff remained financially liable for the loan and title, Ms. Evans

relied on Defendant's statements. During this period, Defendant also began stalking Ms.

Evans's residence, monitoring the residence to see whether the jointly-titled vehicle was present. On one such day, he observed the vehicle at her home and placed a threatening phone call, recorded by Ms. Evans, in which he stated he would "beat her ass" if she was not at work. This call was later used as part of her criminal complaint.

439. Shortly after issuing the threat, Defendant arrived at Ms. Evans's residence during the night and unlawfully removed the jointly-titled Explorer from her residence without her knowledge or consent. He took the vehicle containing Ms. Evans's personal belongings and her children's car seats, leaving her unable to safely transport her children.

440. In an effort to retrieve her children's property, Ms. Evans went to the residence of Defendant's new girlfriend, where the jointly-titled vehicle had been taken. During this encounter, Defendant physically assaulted Ms. Evans, pushing her with significant force and leaving a visible red mark on her shoulder, which she photographed. Despite simply attempting to recover her own children's items, Defendant or the new girlfriend contacted law enforcement and attempted to have Ms. Evans charged with trespassing, even though she had never been trespassed, warned, or prohibited from the property.

441. When Ms. Evans attempted to file a criminal complaint for the assault and the vehicle theft, she encountered the same procedural obstruction repeatedly experienced by the Plaintiff. Law enforcement and municipal personnel informed her that she could not file her own complaint because Defendant had "already filed one," and that her allegations would be "added to his." She was denied an independent case number and was initially prevented from filing her own charge, despite being the victim of property interference, stalking, threats, coercive control, and physical violence.

84

442.   Because she was blocked from filing a warrant for the assault and the property offenses,
       Ms. Evans proceeded with a warrant for the earlier threatening phone call. She
       successfully filed a charge of Domestic Violence 3rd Degree – Harassing
       Communications, resulting in Case No. MC-2025-900061.00. Following the issuance of
       the warrant, Defendant learned of it and turned himself in. Upon release, Defendant
       posted photographs and videos from inside the Millbrook Police Department—including
       images with officers—and publicly mocked Ms. Evans's complaint on social media,
       captioning posts with statements such as "Lying on me trying to get me put in jail," and
       "I don't stay long," demonstrating open disregard for court authority and bond
       conditions.

443.   The prosecuting attorney assigned to Ms. Evans's case was Bradley Allen Hawley, the
       same prosecutor who failed to act on the Plaintiff's domestic violence evidence,
       minimized the Plaintiff's reports, and mishandled the Plaintiff's municipal matters. The
       overlap in personnel and the identical procedural failures in both cases further
       demonstrate a continuing pattern of selective enforcement, lack of protection for
       domestic violence victims, and preferential treatment toward Defendant by the same
       officials.

444.   This incident is not included to litigate Ms. Evans's injuries, but to establish pattern,
       notice, foreseeability, and repetition. Defendant's conduct—stalking, issuing threats,
       exploiting women financially, removing vehicles without consent, taking children's
       property, assaulting Ms. Evans, manipulating through transportation access, and
       involving multiple romantic partners in coercive dynamics—was known or should have
       been known to the Millbrook Municipal Court, its magistrates, its clerk's office, and

Prosecutor Hawley. The recurrence of identical misconduct toward multiple women under the same officials reflects:

a) a pattern and practice of deliberate indifference,
b) failure to protect,
c) selective enforcement,
d) state-created danger, and
e) ongoing equal protection violations.

445. Defendant's continued ability to engage in these patterns—while under active criminal cases, under bond conditions, and in contact with the same municipal prosecutor— demonstrates systemic failure by the involved agencies. The harm experienced by Ms. Evans reinforces the Plaintiff's position that the constitutional violations she suffered were not isolated, but part of a broader institutional pattern of ignoring violence and coercion when the perpetrator is Defendant Ahmaud Maxie.

446. Subsequent court proceedings further demonstrate this pattern of indifference. At Defendant's plea setting in Ms. Evans's case, court personnel informed her that she "did not need to be present" because it was "only his plea date," minimizing her role and discouraging her participation—mirroring the identical instruction previously given to the Plaintiff by Prosecutor Hawley. During this appearance, Ms. Evans provided the Clerk's office with a flash drive containing video footage, audio recordings, and digital evidence documenting Defendant's conduct. Despite receiving contemporaneous digital evidence of stalking, threats, harassment, property interference, and physical aggression, and despite active "No Contact" conditions, the municipal court took no immediate protective action, continued the matter, and allowed Defendant to remain free. These events confirm that even when a second victim came forward with corroborating evidence, the same officials continued a pattern of delay, minimization, and inaction—supporting the

Plaintiff's allegation that these constitutional violations reflect a systemic and ongoing governmental failure.

---

## VII.   CLAIMS FOR RELIEF

### COUNT 1 – 42 U.S.C. § 1983: FOURTEENTH AMENDMENT – PROCEDURAL DUE-PROCESS VIOLATIONS

447.   **Parties:** Judge Joy Pace Booth, Clerk Debra Hill, Special Master Terinna "Tina" Moon, Prosecutor Bradley Hawley, and the City of Millbrook, Elmore County, and Autauga County.

448.   **Incorporation of facts.** Plaintiff realleges and incorporates by reference all preceding paragraphs of the Statement of Facts. These paragraphs detail repeated instances where officials acted under color of state law to deprive Plaintiff of protected liberty and property interests without adequate notice, an opportunity to be heard, or a neutral decision maker. Procedural due process requires notice, an opportunity to present reasons, and a decision by a neutral tribunal.

449.   **Lack of notice and opportunity to be heard.** Defendants repeatedly failed to provide Plaintiff with notice of critical proceedings, including the June 2024 divorce filing where service was mis-returned, the July 9, 2024 pendente-lite hearing, the January 8, 2025 final hearing, and various ex parte orders. Plaintiff often learned of hearings only through docket searches or after orders had been entered, depriving her of a meaningful opportunity to be heard.

450.   **Ex parte orders and biased tribunals**. Judge Booth and Special Master Moon issued numerous ex parte orders—granting subpoena access to confidential medical records, altering custody and support without hearings—and conducted conferences with Plaintiff's counsel and opposing counsel outside Plaintiff's presence. The undisclosed

87

prior conflict between Judge Booth and attorney Julia Collins further undermined neutrality. These actions violated the requirement that decisions be made by a neutral and unbiased tribunal.

451. **Improper service and misdirection of process.** Divorce summonses and criminal subpoenas were mis-served or never served, hindering Plaintiff's ability to respond. Warrants and protection orders were not properly served or explained to Plaintiff, leaving her unaware of conditions affecting custody and safety.

452. **Failure to respond to emergency motions.** Plaintiff filed multiple emergency motions, sworn affidavits, and motions to show cause requesting protection and hearings. The court ignored, delayed, or refused to hear these motions, while simultaneously granting Defendant Maxie's requests, often the same day filed, and without requiring service, notice, or hearings. This denied Plaintiff any meaningful opportunity to defend her rights.

453. **Arbitrary deprivation of property and custody**. Without valid service or hearings, the court froze Plaintiff's bank account; transferred possession of her home and vehicle; imposed financial obligations and contempt-related punishments; and altered custody orders without evidentiary review. Plaintiff was ordered to surrender her only funds for rent and utilities, resulting in homelessness and deprivation of basic needs. These constitute unconstitutional deprivations of liberty and property without due process.

454. **Damages.** As a direct and proximate result of Defendants' actions, Plaintiff suffered loss of custodial rights, loss of housing and transportation, invasion of medical privacy, financial devastation, reputational damage, emotional distress, and homelessness. Plaintiff seeks compensatory damages, declaratory relief holding these orders void for lack of due process, and injunctive relief to prevent ongoing and future violations.

## COUNT 2 – 42 U.S.C. § 1983: FOURTEENTH AMENDMENT – EQUAL-PROTECTION VIOLATIONS FOR DISCRIMINATORY ENFORCEMENT OF DOMESTIC-VIOLENCE LAWS

455. **Parties.** City of Millbrook, Elmore County, and Autauga County.

456. **Incorporation of facts.** Plaintiff realleges all preceding paragraphs of the Statement of Facts. The Equal Protection Clause prohibits state actors from selectively enforcing laws based on impermissible gender-based stereotypes. Non-arrest and under-enforcement policies in domestic-violence cases deny women equal protection by embodying a discriminatory view that male abusers may discipline their partners without consequence. Plaintiff was treated differently than similarly situated victims of domestic violence.

457. **Systematic undercharging and non-arrest.** Law enforcement ignored outstanding warrants for Maxie in August 2023 and failed to arrest him after multiple violent incidents. Prosecutors charged Maxie only with misdemeanor domestic-violence offenses despite evidence supporting more serious charges and consolidated multiple offenses into a single proceeding, minimizing the pattern of abuse. These actions contrast with how comparable violent and property-related offenses are typically enforced, demonstrating selective enforcement.

458. **Failure to enforce PFAs and bond conditions**. Authorities failed to properly serve and enforce protection-from-abuse orders and no-contact conditions, and allowed Maxie to stalk and harass Plaintiff without arrest. At the same time, authorities routinely executed warrants and made arrests for lesser or non-violent offenses, further illustrating disparate enforcement and discriminatory treatment.

459. **Discriminatory service and exclusion from proceedings.** Prosecutors and court personnel misdirected subpoenas and notices, told Plaintiff she did not need to be present at hearings, and discouraged Plaintiff and other women from pursuing independent

complaints and participating fully in criminal cases. These actions impeded women's

access to justice and denied them equal protection.

460. **Damages.** As a direct and proximate result of Defendants' discriminatory actions,

Plaintiff suffered physical injury, emotional distress, financial loss, and deprivation of

liberty. Plaintiff seeks compensatory and punitive damages, and declaratory relief holding

these discriminatory practices unconstitutional.

### COUNT 3 – 42 U.S.C. § 1983: RETALIATION FOR EXERCISING FIRST-AMENDMENT RIGHTS

461. **Parties:** Prosecutor Bradley Hawley and Clerk Debra Hill in their individual capacities.

462. **Incorporation of facts**. Plaintiff realleges all prior paragraphs. A First Amendment

retaliation claim requires proof that: the plaintiff engaged in protected speech; the

defendant took adverse action that would deter a person of ordinary firmness from

continuing that speech; and the action was motivated by the protected speech.

463. **Protected activity.** Plaintiff repeatedly reported domestic violence to police and

prosecutors, filed emergency motions in court, and criticized the failure to prosecute

Maxie. She also filed ethics complaints and extraordinary writs concerning the conduct of

judicial and prosecutorial officials. These activities constitute protected speech and

petitioning.

464. **Adverse actions**. In response, Defendants engaged in punitive and retaliatory conduct,

including misdirecting notices, failing to docket filings, withholding information about

hearings, issuing misleading statements regarding required appearances, and allowing

proceedings to move forward—and ultimately be dismissed—without Plaintiff's

participation. Prosecutor Hawley ignored Plaintiff's evidence in the domestic-violence

appeal cases and provided misleading information that caused Plaintiff to miss critical

hearings. These actions resulted in adverse consequences to Plaintiff, including loss of parenting time and unfavorable orders, and would deter a person of ordinary firmness from continuing to speak out.

465. **Causal connection.** The timing and content of these adverse actions demonstrate retaliatory animus. Punitive consequences followed closely after Plaintiff's filings and complaints—including hearings set immediately after motions to show cause, custody-related actions following ethics complaints, and financial penalties imposed after Plaintiff criticized prosecutorial decisions. Statements by officials indicating potential incarceration if Plaintiff continued pursuing domestic-violence charges further support a retaliatory motive.

466. **Damages.** Defendants' retaliatory conduct caused financial harm, emotional distress, reputational damage, and the loss of fundamental rights. Plaintiff seeks compensatory and punitive damages and declaratory relief.

## COUNT 4 – 42 U.S.C. § 1983: MUNICIPAL LIABILITY (MONELL)

467. **Parties:** City of Millbrook, Elmore County, and Autauga County.

468. **Incorporation of facts.** Plaintiff realleges all prior paragraphs. Under Monell, municipal liability attaches only where a municipal policy, custom, or failure to train is the moving force behind the constitutional violation. It is not enough that a municipality employs a wrongdoer; there must be an official policy, widespread practice, or failure to train evidencing deliberate indifference to constitutional rights.

469. **Policies or customs.** The municipalities maintained customs of:
    a) under-arresting and undercharging domestic-violence perpetrators;
    b) mis-serving subpoenas and failing to provide victims with notice of hearings;
    c) consolidating multiple domestic-violence offenses into single misdemeanor proceedings;
    d) refusing to enforce PFAs and bond conditions; and

e) discouraging victims from participating in criminal cases.

470. These widespread practices resulted in the deprivation of Plaintiff's due-process and equal-protection rights.

471. **Failure to train or supervise**. Municipal officers, clerks, and personnel were inadequately trained and/or supervised regarding: domestic-violence enforcement; protective-order procedures; proper service; victim-notification protocols; constitutional duties; and retaliation avoidance. Officers ignored specific information about Maxie's whereabouts and declined to arrest him for clear violations. Clerks misdirected summonses and told Plaintiff she did not need to attend hearings. These failures constitute deliberate indifference to known constitutional risks.

472. **Causation.** The policies, customs, and failures described above were the moving force behind Plaintiff's injuries. The municipalities' deliberate indifference allowed Maxie to continue assaulting Plaintiff, led to mis-served documents and missed hearings, resulted in unlawful custody and property deprivations, and exposed Plaintiff to ongoing harassment, danger, and financial harm. The systematic minimization of charges and non-enforcement emboldened Maxie and directly caused continued violations of Plaintiff's constitutional rights.

473. **Damages.** As a direct and proximate result of these unconstitutional municipal policies and failures, Plaintiff suffered physical harm, emotional trauma, financial losses, reputational injury, and violations of her constitutional rights. Plaintiff seeks compensatory damages, declaratory relief, and injunctive relief requiring the municipalities to adopt constitutional policies, proper training, and enforcement protocols.

## COUNT 5 – 42 U.S.C. § 1983: FOURTEENTH AMENDMENT – SUBSTANTIVE DUE-PROCESS (STATE-CREATED DANGER AND SPECIAL RELATIONSHIP)

474.   **Parties:** John and Jane Doe law-enforcement officers of the City of Millbrook, Autauga County, and Elmore County.

475.   **Incorporation of facts.** Plaintiff realleges all prior paragraphs. Under the state-created danger doctrine, government actors may violate substantive due process when they affirmatively create or exacerbate a danger by their conduct. A special relationship arises when the state restrains an individual's freedom to act on her own behalf, thereby imposing an obligation to protect.

476.   **Creation or enhancement of danger.** Defendants failed to execute warrants, arrest Maxie for violent offenses, enforce PFAs and bond conditions, or provide Plaintiff with notice of protective orders and court actions. These omissions emboldened Maxie to continue assaulting Plaintiff and sabotaging her property. By consolidating charges and undercharging crimes, the state minimized consequences and signaled tolerance of abuse, thereby increasing Plaintiff's vulnerability.

477.   **Special relationship.** Once Plaintiff obtained a protection-from-abuse order and emergency relief, the state undertook a duty to protect her. Officials' subsequent failure to enforce that order, combined with active interference such as misdirecting service and telling Plaintiff not to attend hearings, violated that duty and increased the danger she faced.

478.   **Damages.** The state's actions and inactions directly resulted in multiple assaults, theft of property, emotional trauma, and ultimately homelessness. Plaintiff seeks compensatory and punitive damages and declaratory relief.

### COUNT 6 – ASSAULT AND BATTERY (ALABAMA LAW)

479.    **Defendant**: Ahmaud Maxie.

480.    **Incorporation of facts.** Plaintiff realleges all prior paragraphs as though fully set forth

herein. Under Alabama law, battery is the intentional infliction of harmful or offensive

physical contact without consent, and assault is placing another in reasonable

apprehension of imminent harmful or offensive contact.

481.    **Acts constituting assault and battery**. Maxie intentionally and unlawfully grabbed,

struck, choked, and otherwise used physical force against Plaintiff on multiple occasions,

including but not limited to:

   a)  the October 2023 assault in which he broke a door and struck Plaintiff;
   b)  the April 24, 2024 incident where he seized her throat;
   c)  the June 14, 2024 assault and strangulation in front of their children;
   d)  additional encounters in which he shoved, grabbed, or physically restrained Plaintiff.

482.    These acts were harmful and offensive, caused bruises and breathing difficulty, and

created a reasonable fear of imminent harm. Plaintiff never consented to any of the

contact.

483.    **Damages.** As a direct and proximate result of Maxie's conduct, Plaintiff suffered physical

injury, pain, emotional trauma, and ongoing harm. Plaintiff seeks compensatory and

punitive damages.

## COUNT 7 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGE) (ALABAMA LAW)

484.    **Defendant:** Ahmaud Maxie.

485.    **Incorporation of facts.** Plaintiff realleges all prior paragraphs. Intentional infliction of

emotional distress occurs when a defendant's outrageous conduct intentionally or

recklessly causes severe emotional distress.

486. **Extreme and outrageous conduct.** Maxie engaged in extreme and outrageous conduct

that exceeds all bounds of decency tolerated in a civilized society, including:

a) repeated physical assaults;
b) threats to evict Plaintiff while she was pregnant;
c) sabotage of her vehicle and means of transportation;
d) stalking, surveillance, and monitoring of her movements;
e) financial coercion and control;
f) public humiliation and spreading false accusations; and
g) removing the children from Plaintiff without notice or justification.

487. This conduct falls squarely within the narrow category of domestic-violence cases in

which Alabama courts recognize the tort of outrage.

488. He exploited Plaintiff's pregnancy, postpartum condition, and dependence, deliberately

inflicting emotional harm.

489. **Intent or recklessness.** Maxie acted intentionally or, at minimum, with reckless

disregard for the likelihood of causing severe emotional distress. He admitted to stalking

Plaintiff, boasted about manipulating her housing situation, and continued abusive

conduct despite multiple court orders and repeated warnings.

490. **Severe emotional distress**. As a direct result of Maxie's conduct, Plaintiff suffered

anxiety, trauma, depression, fear for her safety, and recurrent panic attacks. She

experienced significant medical complications during pregnancy, was bedridden for

extended periods, and continues to suffer long-term emotional and psychological harm.

Plaintiff seeks compensatory and punitive damages.

### COUNT 8 – CONVERSION AND TRESPASS TO CHATTELS (ALABAMA LAW)

491. **Defendant**: Ahmaud Maxie.

492. **Incorporation of facts.** Plaintiff realleges all prior paragraphs. Conversion is the

intentional exercise of dominion or control over another's personal property that seriously

interferes with the owner's rights. Trespass to chattels occurs when a defendant

intentionally interferes with the possession or use of personal property, resulting in harm.

493. **Wrongful taking and control.** Maxie wrongfully exercised control over Plaintiff's

property by draining joint bank accounts; stealing her phone and keys; disconnecting

hoses, removing fuses, and otherwise sabotaging her vehicle; removing and selling the

marital vehicle; withholding the children's car seats; seizing Plaintiff's only available

funds under court orders; and leaving Plaintiff stranded without transportation. These acts

deprived Plaintiff of property and interfered with her ability to use essential items.

494. **Trespass to chattels.** Maxie repeatedly entered Plaintiff's residence without consent,

rummaged through her belongings, and damaged household items. He interfered with

Plaintiff's phone by seizing and throwing it during attempts to call 911, breaking the key

fob, and monitoring or accessing her devices without consent.

495. **Damages**. Plaintiff suffered financial losses—including the loss of her vehicle, phone,

bank funds, clothing, and household goods—lost business opportunities, and emotional

distress. She seeks compensatory and punitive damages.

## COUNT 9 – MALICIOUS PROSECUTION AND FALSE IMPRISONMENT (ALABAMA LAW)

496. **Defendants:** Ahmaud Maxie, Prosecutor Bradley Hawley, and the City of Millbrook.

497. **Incorporation of facts.** Plaintiff realleges all prior paragraphs. Malicious prosecution

occurs when a defendant institutes or continues a legal proceeding with malice and

without probable cause, and the proceeding terminates in the plaintiff's favor. False

imprisonment is the willful detention of a person without consent or legal authority.

498. **Malicious prosecution**. Maxie initiated multiple criminal complaints against Plaintiff—

including allegations of theft, harassment, and domestic-violence offenses—without

probable cause and in direct retaliation for Plaintiff reporting his abuse. Prosecutor Hawley continued these proceedings despite clear exculpatory evidence and despite knowing the allegations were retaliatory. Each of the charges terminated in Plaintiff's favor through dismissal, satisfying the favorable-termination requirement. The timing of these filings, occurring immediately after Plaintiff sought police protection or filed motions in court, demonstrates malice.

499. **False imprisonment.** Maxie unlawfully detained Plaintiff by physically blocking her vehicle, seizing her keys, locking her out of the residence, and preventing her from leaving during violent incidents. These acts restrained Plaintiff's freedom of movement without consent or legal authority. Additionally, criminal proceedings were initiated and maintained against Plaintiff without probable cause, resulting in coercive restrictions on her liberty and exposing her to arrest based on baseless allegations.

500. **Damages**. Plaintiff suffered loss of liberty, legal expenses, reputational harm, and emotional distress. She seeks compensatory and punitive damages.

## COUNT 10 – LEGAL MALPRACTICE / BREACH OF FIDUCIARY DUTY (ALABAMA LEGAL SERVICES LIABILITY ACT)

501. **Defendant:** Julia Collins.

502. **Incorporation of facts**. Plaintiff realleges all prior paragraphs. This claim is brought exclusively under the Alabama Legal Services Liability Act (ALSLA), *Ala. Code § 6-5-570 et seq.,* which governs all civil claims against legal service providers.

503. **Duty and breach.** Plaintiff retained Julia Collins to represent her in divorce and custody proceedings. Collins owed duties of competence, diligence, loyalty, and disclosure. She breached these duties by:

   a) failing to disclose her prior contempt arrest involving Judge Booth, creating a conflict of interest;

97

b) failing to object to ex parte orders and jurisdictionally defective proceedings;

c) misinforming Plaintiff about available custody options;

d) failing to ensure proper service or respond to filings, allowing orders to be entered without Plaintiff's participation;

e) withholding critical information and failing to provide records necessary for Plaintiff to protect her rights; and

f) abandoning representation without ensuring continuity or advising Plaintiff of imminent hearing dates.

504. **Proximate causation and damages.** Collins's breaches caused Plaintiff to lose opportunities to seek emergency relief, challenge ex parte actions, and present evidence, resulting in loss of custody, property, income, and additional legal expenses. Plaintiff seeks compensatory damages under ALSLA.

### COUNT 11 – NEGLIGENT TRAINING AND SUPERVISION (ALABAMA LAW)

505. **Defendants:** City of Millbrook, Elmore County, and Autauga County.

506. **Incorporation of facts.** Plaintiff realleges all prior paragraphs. These municipalities owed a duty to hire, train, and supervise their employees to ensure adherence to constitutional, statutory, and departmental requirements. The municipalities knew or should have known that their personnel were engaging in conduct that created a foreseeable risk of harm to victims of domestic violence, including Plaintiff.

507. **Failure to train and supervise.** Municipal officers and clerks were not adequately trained or supervised regarding domestic-violence enforcement, protective-order service, victim-notification protocols, proper service of process, constitutional duties, and avoidance of retaliatory actions. The municipalities failed to address repeated patterns of misconduct—including failure to arrest Maxie for violent offenses, misdirected service, inaccurate information given to victims, and discouraging victim participation in criminal proceedings. These deficiencies in training and supervision created a foreseeable risk of harm and directly contributed to Plaintiff's injuries.

508. **Damages.** As a result of the municipalities' negligent training and supervision, Plaintiff suffered physical harm, financial loss, emotional distress, and violations of her legal rights. She seeks compensatory damages and any other relief deemed appropriate.

### COUNT 12 – DEFAMATION AND FALSE LIGHT (ALABAMA LAW)

509. **Defendant:** Ahmaud Maxie.

510. **Incorporation of facts.** Plaintiff realleges all prior paragraphs. Defamation requires a false statement presented as fact, published to a third party, and causing injury. False light involves public disclosure of information that places a person in a misleading or highly offensive position before the public.

511. **False statements**. Defendant Maxie published numerous false statements about Plaintiff, including allegations of drug use and theft, claims that she abandoned her children, and insinuations of promiscuity. These statements were made to court officials, law enforcement, and the public through filings and social media, and were presented as fact.

512. **Publication and publicity.** Maxie filed affidavits, electronic communications, and social-media posts repeating these false claims. These publications were disseminated to third parties, incorporated into various proceedings, and widely accessed through public records, harming Plaintiff's reputation.

513. **Fault.** Defendant acted negligently or with actual malice. Maxie fabricated allegations to gain tactical advantage in criminal, civil, and custody matters. His repetition of obviously false statements, coupled with intentional misuse of legal processes, demonstrates reckless disregard for the truth.

514. **Damages.** Plaintiff's reputation and standing in the community were severely damaged. She lost business opportunities, suffered emotional distress, and experienced significant personal harm. Plaintiff seeks compensatory and punitive damages.

## *VIII.   PRAYER FOR RELIEF*

515.   **WHEREFORE**, Plaintiff respectfully requests judgment in her favor and against

Defendants as follows:

**Declaratory Relief**

516.   A declaration that Defendants violated Plaintiff's rights under the First, Fourth, and

Fourteenth Amendments and 42 U.S.C. § 1983.

517.   A declaration that the following practices were unconstitutional:

   a)  Ex parte hearings without lawful service;
   b)  Suppression of victim evidence;
   c)  Retaliatory contempt, custody, bond, and eviction actions;
   d)  Selective enforcement of domestic-violence laws;
   e)  Coordinated interference with court access.

**Prospective Injunctive Relief**

518.   An injunction prohibiting enforcement of any order entered without lawful notice.

519.   An injunction requiring preservation and production of all court, clerk, prosecutorial, and

law-enforcement records related to Plaintiff.

520.   An injunction prohibiting retaliatory use of contempt, custody, bond, or eviction process.

521.   An injunction requiring verified lawful service and recorded hearings in any future

custody proceedings involving Plaintiff.

**Compensatory Damages**

522.   Compensatory damages for:

   a)  Loss of custody and family integrity;
   b)  Loss of housing and transportation;
   c)  Destruction of Plaintiff's business;
   d)  Financial and credit damage;
   e)  Emotional distress;
   f)  Reputational harm;
   g)  Out-of-pocket expenses.

523.   Damages to be determined by a jury.

**Punitive Damages**

524.   Punitive damages against individual Defendants for willful, malicious, and reckless

violations of Plaintiff's rights.

**Municipal Liability Damages**

525.   Compensatory damages against City of Millbrook, Autauga County, and Elmore County

under Monell for unconstitutional customs, policies, and failure to train.

**Fees and Costs**

526.   Attorney's fees and costs under 42 U.S.C. § 1988.

**Equitable Relief**

527.   An order declaring void any custody, enforcement, or eviction orders entered without

lawful notice.

528.   An order prohibiting continued reliance on void orders.

**Further Relief**

529.   Such other relief as the Court deems just and proper

**Respectfully submitted this 11th day of December, 2025.**

*/s/Kelsie Elrod*
Pro Se

**Kelsie Elrod**
1799 Co Rd 85
Prattville, AL 36067
(334) 399-5570
Kelrod133@yahoo.com